Appellant, Walter McMillian, was jointly indicted with Ralph Myers, in a two-count indictment, on December 11, 1987, in Monroe County, for the capital offense of murder committed during a robbery in the first degree, in violation of §13A-5-40(a)(2), Code of Alabama 1975. The indictment reads, in pertinent part, as follows:
"COUNT I
 "The Grand Jury of said County charge that before the finding of this indictment, Walter McMillian, alias Johnny D. McMillian and Ralph Myers . . . did, intentionally cause the death of Ronda Morrison, by shooting her with a pistol, in violation of Section 13A-6-2 of Code of Alabama, and the said Walter McMillian, alias Johnny D. McMillian and Ralph Myers caused said death during the time that the said Walter McMillian, alias Johnny D. McMillian and Ralph Myers did, in the course of committing or attempting to commit a theft of $35.00 dollars in lawful United States Currency, the property of Rick Blair, use force against the person of Ronda Morrison, with intent to overcome her physical resistance or physical power of resistance, while the said Walter McMillian, alias Johnny D. McMillian was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama, all of which is in violation of Section 13A-5-40(a)(2), of the Code of Alabama,. . . .
"COUNT II
 "The Grand Jury of said County further charge that before the finding of this indictment, Walter McMillian, alias Johnny D. McMillian and Ralph Myers . . . did, intentionally cause the death of Ronda Morrison, by shooting her with a *Page 1287 
pistol, in violation of Section 13A-6-2 of Code of Alabama, and the said Walter McMillian, alias Johnny D. McMillian and Ralph Myers caused said death during the time that the said Walter McMillian, alias Johnny D. McMillian and Ralph Myers did, in the course of committing or attempting to commit a theft of $35.00 dollars in lawful United States Currency, the property of Ronda Morrison, use force against the person of Ronda Morrison, with intent to overcome her physical resistance or physical power of resistance, while the said Walter McMillian, alias Johnny D. McMillian was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama, all of which is in violation of Section 13A-5-40(a)(2), of the Code of Alabama,. . . ."
The only difference in the counts of the indictment is the allegation of ownership of the money alleged to have been taken in the robbery.
At arraignment on December 14, 1987, appellant pleaded not guilty. He moved to sever his case from that of Myers, and his motion was granted on November 13, 1987. On November 13, 1987, he moved for a change of venue, alleging that due to extensive pretrial publicity, he would be unable to receive a fair trial in Monroe County. After an evidentiary hearing, the trial court granted the motion and transferred the case to Baldwin County for trial.
On August 17, 1988, a Baldwin County jury found appellant guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-43 through -46, and the jury returned an advisory verdict recommending that the penalty be life imprisonment without the possibility of parole. Five jurors recommended the death penalty, and seven recommended a sentence of life imprisonment without parole.[1] Thereafter, the trial court held another sentencing hearing, in accordance with §§ 13A-5-47
through -52, and after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced appellant to death.[2]
The state's evidence showed that, on Saturday morning, November 1, 1986, Ronda Morrison, who worked for Jackson Cleaners in downtown Monroeville, opened the establishment for business about 9:05 a.m. When she arrived, she parked her automobile beside the building, unlocked the door, and entered the building carrying a small money bag. Shortly thereafter, Ray Owens entered the establishment to pick up some clothes that he had previously left for cleaning. Morrison went into the back of the establishment and brought his clothes to the front counter. His bill was approximately $13.00, and he paid her with a $20.00 bill. Morrison when to a desk, got some change out of a bag, made change for his $20.00 bill, and put the bill in the cash register. As he left, he noticed that she was putting other money in the cash register. About 11:30 a.m., he heard on his radio "scanner" that something had happened at Jackson Cleaners.
Around 10:10 a.m. or 10:15 a.m., Jan Owen entered the establishment and left a skirt with Morrison for cleaning. She did not see anyone else and did not observe anything unusual. Around 10:40 a.m. or 10:45 a.m., Jerrie Sue Dunning entered the establishment, and no one came to assist her. She called out several times, "Is anyone here?" She received no answer. She noticed that the cash register was open, and she testified that she observed bills and change in the cash register. Shortly thereafter, Florence Masons entered the establishment, and a few minutes before 11:00 a.m., Coy Stacey entered. The three of them began a search and discovered Morrison's body lying on the floor under a rack of clothing in the back of the cleaners. They called the police. *Page 1288 
One of the first officers to arrive was Woodrow Ikner of the Monroeville Police Department. He arrived around 11:05 a.m. He knew Morrison, who was 18 years of age. She was lying face-down, and there were blood stains on her face and on the back of her shirt. He checked for a pulse, but found none, and discovered that the body was "cool." Her pants and shirt were unbuttoned, and her undergarments were visible. Three spent bullet casings and a part of a bullet were found near the body. Another spent casing was found in the bathroom in the rear of the establishment and about 50 feet from the body, and one was found outside the bathroom door. The bathroom showed signs of a scuffle. There was a bullet hole in the bathroom ceiling. The victim's gold necklace was found on the bathroom floor. A brick was found in the bathroom with hair on it, and an impression in the wall was discovered that had apparently been made by the brick being hurled against the wall. There was dust on the victim's clothing and some indication that she had been dragged to the spot where her body was found. Ikner discovered one drop of blood on the floor near the cash register. He dusted the cash register and the area around it for fingerprints and found only unidentifiable smudges. The police officers testified, and the photographs taken at the time shows, that the cash register was open and contained only some change.
Morrison was pronounced dead by Coroner Farrish Manning at 11:30 a.m. Dr. Gary Dean Cumberland, a state pathologist, performed an autopsy on the victim's body. He found numerous scratches and bruises on the right side of her neck and forehead. Three gunshot wounds were discovered: one to the back side of her right shoulder; one to the left side of her back; and one to the back side of her upper arm. Three bullets were recovered from her body. The pathologist found that the cause of death was the three gunshot wounds. He concluded that death would have resulted from the wounds within 10 to 20 minutes, but that unconsciousness would probably have occurred within minutes. There was a substantial amount of internal bleeding, but little external bleeding.
A ballistics expert concluded that the three bullets recovered from the victim's body were .25 caliber and that all were fired from the same gun, probably from an automatic manufactured by Raven Arms Company. He examined the bullet holes in the victim's shirt and discovered powder residue around one bullet hole. He concluded that the gun that fired that bullet was fired from within six inches of the victim's body. He could reach no conclusion regarding the distance at which the gun was fired when the other two wounds were inflicted.
Joe Hightower, a 22-year-old welder, testified that "sometime up in the morning" on the day of the killing, he was passing by Jackson Cleaners and observed appellant's truck "sitting at the cleaners." He knew the truck well, having seen it over a "hundred times." He had been to appellant's house and had seen the truck there. He described the truck as a green, low-rider type, sporty, and "souped up." He had always wanted a truck like that and had never seen another one like it. He observed no other vehicles at the cleaners at that time. After observing the truck, he went home and, around noon or 1:00 p.m., his wife told him about hearing of the incident that had just occurred at the cleaners. He remembered that he had seen appellant's truck at the cleaners, but he did not report it. On cross-examination, he testified that he gave the information to the sheriff a few days before the commencement of the trial and, when asked why he had not come forward sooner, he stated that he was scared. On re-direct, the prosecutor asked him why he was scared, and he stated, "Just because the reasons I have been to his house." The prosecutor then asked, "Mr. Hightower, why were you scared to come forward with this information?" He replied, "Because when you fool with drugs and you don't know, if you get involved with something like that it could cause [sic] you your life, too." *Page 1289 
Bill Hooks, Jr. testified that, on the day of Morrison's murder, he was working at Kenny Blanton's about three or four miles from Jackson Cleaners; that "about the middle of the morning," he went to Taylor's Parts in Monroeville to buy some parts for an automobile that he was working on; and that, as he was passing Jackson Cleaners, on returning to Blanton's, he saw appellant's truck parked there. He saw Ralph Myers in the truck on the driver's side, and appellant was getting in the truck. He had known appellant for several years and had done work for him. He was familiar with appellant's truck; he described it as a green, low, down to the ground Chevrolet truck; and he had never seen anybody besides appellant drive the vehicle before. He testified that the truck "speeded out" and went on down the highway and, about five minutes later, he heard the police and ambulance sirens going up the road toward Jackson Cleaners. Sometime later, he saw the truck at the Monroe County Jail and noted that it had been painted black, but that the interior of the truck bed was still green.
Ralph Bernard Myers, who was indicted along with appellant for the same capital offense and whose case was pending at the time of the instant trial, testified for the state. He testified that, on November 1, 1986, appellant asked him to drive appellant from Evergreen to Monroeville so he could "take care of some business." Appellant told him that he wanted him to drive his truck for him because his arm was "hurting." Myers agreed and drove appellant to Monroeville in appellant's green Chevrolet truck. Upon arriving in Monroeville, appellant directed him to park in a shopping center parking lot near a Piggly Wiggly store and next to Jackson Cleaners. Appellant got out of the truck, said he would be back in a minute, and went toward the Jackson Cleaners. In a few minutes, appellant came back and said that he was sorry it was taking so long and that "they couldn't find what he was looking for." Appellant went back in Jackson Cleaners and, a short time later, came out again. He again said he was sorry it was taking so long and that Myers should go to a store if he needed anything. Appellant went back toward Jackson Cleaners, and Myers drove to a gas station and bought some cigarettes. Myers returned in about 10 minutes and parked in approximately the same location. He observed an automobile parked in front of the cleaning establishment and observed two men go inside and come back with some clothes. Then he heard "popping noises" coming from inside the building and, in two or three seconds, heard them again. The noises sounded like firecrackers. Myers got out of the truck and went into the building, where he saw appellant kneeling down behind the counter, taking money out of a paper sack, and putting it in a brown "zipup case." He also saw a young girl lying on the floor with her mouth about half open. Appellant had a small caliber automatic pistol in his hand. When appellant saw Myers, he grabbed Myers and shoved him against the wall. Myers heard the voice of another person in the back of the cleaners, and he observed the back of a white man with shoulder-length, "blackish-grayish hair," who was carrying something in his hand that looked like a piece of pipe. The man hollered for appellant and said, "How am I going to get out of here without him seeing me?" Myers heard "mumbling" and voices in the rear of the cleaners and heard someone say, "Get the stuff and get out of here." A voice said, "You need to get rid of him too." Appellant said, in response, that he could not because he was "out of something." Appellant threatened him, telling him he would kill him and his wife and kids if he ever said anything, and told him to go outside. Myers returned to the truck and, in a few minutes, appellant came out and "told me to get him out of there, his arm was hurting." He was carrying a "little brown satchel," which was bulging out from "stuff that was in it" and, from the imprint on the satchel, it looked like there was gun in it. As Myers started to drive away, the truck stalled. Appellant got out, raised the hood, and started the engine. They drove away in the direction of Evergreen. On the way back to Evergreen, appellant told Myers to keep his mouth shut or "I'd wind up being *Page 1290 
dead." They were back in Evergreen before lunch.
Myers further testified that, three days later, appellant and another man picked him up and that appellant threatened him again. Appellant told him that "I had a lovely family to be destroyed if I opened my mouth." The other man fired a shotgun into the ground. Appellant, on several occasions afterwards, asked Myers if he had said anything. On one occasion, Myers asked appellant who the white man was in Jackson Cleaners, and appellant said, "[S]omebody very important that could get somebody hurt." Myers further testified that, after the incident at Jackson Cleaners, appellant painted his green truck black.
Appellant did not testify; however, he called several witnesses in an effort to cast doubt upon the testimony of Hooks and to establish an alibi.
William Tidmore was called as a defense witness and, on direct examination, testified that Hooks told him sometime after the date of the murder that he may have seen appellant's truck parked at Jackson Cleaners on that date, but did not give him the names of any persons he may have seen. However, on cross-examination, he testified that he had previously told Sheriff Thomas Tate about Hooks's coming back from Monroeville after going for automobile parts on the date of the incident, about hearing sirens "going off," and about Hooks's saying something about something must have happened at Jackson Cleaners.
Minnie McMillian, appellant's wife, testified that Hooks came to her home a few days after appellant was arrested for the murder and said nothing about seeing appellant and Myers at Jackson Cleaners on the date of the incident. She also testified that, on the date of the murder, appellant was home all day except for about 10 minutes when he went to his brother's to borrow a pot for frying fish; that the transmission had been removed from his truck on that date; and that a fish fry was held at appellant's home that date. She testified that she was certain about the date because Earnest Welch, a white man who collects for a furniture company in Monroeville, came out that date to collect from her mother; that he always comes on the first of the month; and that he never missed coming on the first. She also testified that Welch stopped by where Jimmy D. Hunter and appellant were working on appellant's truck and told them that Welch's niece had been killed that day at Jackson Cleaners. She was positive about Welch's being there on that occasion.
Jimmy D. Hunter testified that he worked on the transmission of appellant's truck on the date of the murder; that appellant was home all day; that Welch, the collector for a furniture company, came by; that he knew Welch and had an account with him; and that Welch told him and appellant about his niece being killed at Jackson Cleaners.
James Franklin McMillian testified that he saw appellant and Hunter about 7:00 a.m., at appellant's home, on the date of the murder; that they were working on appellant's truck; that he passed appellant's house several times that day and that he saw him on each occasion; that appellant came to his house and borrowed a pot for frying fish; that when he came for the pot, he was driving a vehicle other than his truck; and that appellant was at home all morning.
Evelene Smith, appellant's sister, testified that she arrived at appellant's home on the date of the incident at about 10:15 a.m.; that he was there when she arrived; that she did not see him leave that morning; and that she saw Hunter and Welch there. She further testified that Louise Gibbs came and said, "Sister, we would have been over here but the reason we are late is because Ronda got killed right there where you work at the cleaners."
Doris Stevens Hand, who is married to appellant's nephew, testified that she observed appellant at his home on the date of the incident from 10:30 a.m. to noon; that he never left his house; and that she and appellant talked with the "fish man."
Carolyn McMillian, who is married to the son of appellant's sister, Evelene Smith, testified that she saw appellant at his home when she arrived between 10:00 and 11:00 *Page 1291 
a.m. on the date of the incident; that she remained there until it became dark; that appellant was there the entire time; that she saw the "fish man" and the "furniture man," who are both white, come by; and that, about noon, Louise Gibbs came by and told them about the killing. She also testified that she and her mother-in-law, Evelene Smith, had gone to the courthouse, sometime after the incident, and told Sheriff Tate and other officers that appellant was at home all day on the day of the incident.
Sheriff Tate was called as a witness for the defense and asked if he remembered Carolyn McMillian and her mother-in-law coming to the courthouse and telling him and other officers that, on the date of the incident, appellant was at home all day, and he testified that he had seen the ladies talking with one of the officers, but he could not recall such a conversation.
The state called Earnest Welch in rebuttal. Welch testified that he has been a furniture salesman for 22 years; that the victim was his niece; that she was killed on Saturday, November 1, 1986; that he did not see appellant on the date that his niece was killed; that he did not go to appellant's house on that date, but had gone to his house on Friday, October 31, 1986, to collect from appellant's mother-in-law, Ida Bell Anderson, who lived behind appellant; that he did not see Hunter and the others who testified that they had seen him at appellant's house on November 1, 1986, because he did not go there on that date; and that government checks "come out" on Friday when the first of the month is on Saturday and that was why he had called on Anderson to collect on Friday, October 31. He identified the collection records of the furniture company, which were kept in the ordinary course of business, and the records showed that he collected payment for furniture from Anderson on October 31, 1986.
Appellant appeals, raising 17 issues.
 I.
Appellant first contends that the trial court committed reversible error by refusing to exclude the state's evidence for insufficient corroboration of accomplice testimony. He argues that state's witness Ralph Myers was an accomplice in the commission of the crime; that his conviction was based upon Myers's testimony; that Myers's testimony was not corroborated as required by law; and that, as a result, the state's evidence should have been excluded or appellant's motion for a judgment of acquittal should have been granted.
Section 12-21-222, Code of Alabama 1975, provides as follows:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
The state contends that Myers was not an accomplice and that, in any case, whether Myers was an accomplice was a question for the jury to decide. It bases this contention on Myers's testimony that, while he drove appellant to the scene of the crime and was present at Jackson Cleaners at the time the crime was committed, he had no knowledge that either a robbery or a murder would take place. While an argument can be made that Myers was not an accomplice, the trial court, nevertheless, considered him to be an accomplice as a matter of law and instructed the jury accordingly. The trial court instructed the jury as follows:
 "Now, ladies and gentlemen, the testimony of an accomplice has been offered in this case for your consideration, and as a matter of law, this particular witness is an accomplice and I want to say this to you: for obvious reasons, the law looks with suspicion on the testimony of an accomplice and, as a reflection of that position, has established certain required conditions to be met before the jury would be authorized to consider it.
 "Now, this brings this Court to the position of instructing you as follows: When such circumstances arise, that is, where an accomplice testifies in the trial *Page 1292 
of a criminal case, the law of this State, specifically, a certain Title of the Code, comes into effect and prohibits a conviction of a defendant in a case of this sort unless the testimony of an accomplice is corroborated by other and independent evidence which tends to connect the defendant with the commission of the offense.
 " 'Corroborate' means to make more certain, to confirm, or to strengthen the testimony of the accomplice. 'Other evidence' must be independent of the testimony of the accomplice, and while such corroborating evidence need not be strong enough or sufficient in itself to support a conviction, it must legitimately tend to connect the defendant with the commission of the offense.
 "The burden of proving the corroborating evidence and convincing each and every member of the jury of its existence and truth rests upon the State. If the State has discharged this burden, along with the burden of proving beyond a reasonable doubt the testimony of the accomplice to each and every member of the jury, the jury will then be authorized to consider all of this evidence, accomplice and corroborative, and assign to all of it such weight and credibility it is entitled to receive.
 "On the other hand, if the State has failed to prove the corroborating evidence beyond a reasonable doubt to each and every member of the jury, the jury is not authorized to consider in any way the testimony of the accomplice. In short, it cannot be considered because it has not been corroborated as required by law."
The trial court having found Myers to be an accomplice, and having instructed the jury that he was such and that it must find that his testimony was corroborated in order to consider it, the question we must now decide is whether Myers's testimony was corroborated by other evidence tending to connect appellant with the commission of the crime.
The test for determining the sufficiency of the corroborative evidence of the testimony of an accomplice is a subtraction process. The evidence of the accomplice must be eliminated, and then if, upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration. Miller v. State, 290 Ala. 248,275 So.2d 675 (1973); Steele v. State, 512 So.2d 142 (Ala.Cr.App. 1987); McCoy v. State, 397 So.2d 577 (Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala. 1981); Kimmons v. State,343 So.2d 542 (Ala.Cr.App. 1977). Corroborative evidence need not be strong, nor sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so. Andrews v. State, 370 So.2d 320
(Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979).
In applying the test to the instant case, we find that the only evidence presented that arguably corroborates Myers's testimony was the testimony of witnesses Hightower and Hooks. Hightower testified that he saw appellant's truck parked near Jackson Cleaners "sometime up in the morning" of the murder. Hooks testified that, on the morning that the crime was committed, he was working at Kenny Blanton's used car dealership, which is located three or four miles from Jackson Cleaners; that he drove into Monroeville that morning to get some auto parts; that, on his way back, he passed Jackson Cleaners and saw appellant's truck parked there; that he saw Myers[3] sitting on the driver's side in the truck and appellant getting into the truck; that, when appellant got into the truck, it "speeded out" down the highway toward Evergreen; and that, about five minutes after he had gotten back to Kenny Blanton's, he heard sirens of police cars and ambulances going toward Jackson Cleaners.
Being in the company of an accomplice in proximity in time and place to the commission of the crime is not always sufficient corroboration to meet the requirements of our statute; however, if, at or about the *Page 1293 
time of the commission of the offense, the accused and the accomplice were together, in or near the place where the crime was committed, this may, in conjunction with other facts and circumstances, sufficiently tend to connect the accused with the commission of the crime to furnish the necessary corroboration of the accomplice. Kimmons v. State.
 "Additional facts and circumstances, however slight, must be adduced to support the testimony of the accomplice in addition to or in conjunction with those of proximity, chronologically and graphically, to the alleged offense in the association of an accomplice. In conjunction with the facts of proximity and association, those additional facts and circumstances may consist of flight of the accused. . . ."
Id. at 547 (emphasis added). See also Caldwell v. State,418 So.2d 168 (Ala.Cr.App. 1981).
The evidence, other than Myers's testimony, clearly supports the inference that appellant was in Myers's company at the time and at the place of the murder. Although neither Hooks's nor Hightower's testimony was precise as to the time of each's observation, all the evidence (excluding Myers's testimony) indicates that the murder was committed at some point within a 30-minute period, from about 10:15 to 10:45 a.m. This conclusion is supported by the testimony of those witnesses who last saw the victim alive, those who discovered the body, and the officer who was first on the scene. It is further a reasonable inference, from the evidence, that Hooks observed appellant and Myers together, at Jackson Cleaners, about the time that the crime would have occurred. This inference is buttressed by the fact that, a few minutes after this observation, he heard sirens of emergency vehicles promptly going to Jackson Cleaners.
We have here the additional fact of appellant's flight. It can reasonably be inferred from Hooks's testimony that the truck "speeded out" down the highway toward Evergreen, that appellant was fleeing from the scene of the crime to avoid detection. Thus, the testimony showing appellant, in the company of Myers, getting into his truck at the scene of the crime, at the particular time that he was observed, and his flight from the scene toward Evergreen sufficiently corroborated the testimony of Myers and tended to connect appellant with the commission of the crime. We find that Myers's testimony was sufficiently corroborated to meet the requirements of § 12-21-222, and that the trial court's denial of the motion to exclude or for a judgment of acquittal on that ground was proper.
 II.
Appellant contends that he was denied his right to due process by the state's failure to disclose agreements it had made with witnesses Myers and Hooks. He relies on Giglio v.United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
(1972), which holds that, where the prosecution's case depends almost entirely on the testimony of a witness, the witness's credibility becomes an important issue in the case, and evidence of any understanding or agreements as to future prosecution of that witness would be relevant to his credibility, and the jury is entitled to know of such understanding or agreements.
Myers testified, before the jury, that he had an agreement with the state that, in exchange for his testimony, he would be allowed to plead guilty to a non-capital offense and that, although he had decided to testify in the instant case, he had not yet decided whether he would enter a guilty plea. He testified, "My lawyer had made the deal that my life would be spared." There is nothing else in the record concerning the details of the agreement.
Appellant has attached, as an appendix to his brief, a copy of what purports to be a minute entry in the case of State v.Myers, Case No. CC-87-683, showing that on January 6, 1989, Myers entered a plea of guilty to robbery in the third degree and received a sentence of 30 years' imprisonment. The case number (87-683) is in numerical sequence to the case number in the instant case (87-682), and the minute entry *Page 1294 
obviously reflects the disposition of the capital charge against Myers. The guilty plea was entered approximately five months after Myers testified in the instant case.
Appellant is apparently contending that the state had an agreement or understanding with Myers that is contrary to his testimony about such, and that the state knowingly allowed him to testify falsely. The record before us does not disclose whether the state, prior to trial, informed appellant of the existence of the agreement with Myers and its details or if appellant knew of the agreement and its details. The record further does not disclose that the agreement was anything other than what Myers said it was at the time he testified, and it does not support the contention that the state allowed Myers to testify falsely.
The record shows that Hooks was arrested on the night of the murder for "public lewdness" (urinating in a public place), and was placed in the Monroeville city jail; that he attempted to tell the officers at the jail that night that he had observed appellant, his truck, and another party who he did not know at the time, at Jackson Cleaners earlier in the morning of that day, but that they would not listen to him; and that the next day, November 2, 1986, he was released on a $100 bond, which was signed by his father. Hooks testified that, in the early part of 1987 between January and April, he was serving a six-month sentence in the Evergreen jail for another offense and recognized Myers, who was an inmate in the jail, as the person he had seen in appellant's truck at Jackson Cleaners on the day of the murder. He notified the authorities and the investigation apparently centered on Myers. According to Hooks, this time the authorities listened to him and believed him. Shortly afterwards, according to Hooks, he completed serving his time and returned to Monroe County where he faced a trespassing charge in circuit court.
This proceeding, in the Monroe County Circuit Court, as related by Hooks, gives us some concern. We quote from the record, as follows:
 "Q. [Defense counsel]: [W]hy did you go to court in Monroe County?
 "A. I don't know why I went to court in Monroe County.
 ". . . . "Q. What judge did you go before?
"A. Judge Key.
"Q. Same Judge who is sitting here?
"A. Yes, sir.
 "Q. What happened when you went before this illustrious Judge?
 "A. We went before this and they told me that the evidence — that I had done statements that I had done gave them and if I remember right —
 "Q. Wait. What statements you had given them? You mean statements in reference to what you saw at Jackson Cleaners?
 "A. Yes, sir. . . . And they told me, you know, if I needed any more questions, ask anybody, get me a lawyer or something like that. And my lawyer, Mr. Elbrecht — They had done put on my record I had been charged with trespassing and they had already told me I be under unsupervised probation and I got six months on probation. They told me I get out here and mess up they going to put me back in jail. So I went back out there and I did not mess up so they couldn't put me back in jail.
 "Q. All of this happened in Monroe County before this Judge who is sitting right before us now?
"A. Yes, sir.
 "Q. O.K., and did I understand you to tell me that you didn't have any type of crime that you were charged with in Monroe County?
"A. No, sir, I did not, not at that time.
 "Q. But you nevertheless you go before this Judge; is that right?
"A. Yes, sir.
 "Q. And the only thing they talked about before the Judge is not a crime you were charged with committing in Monroe County, but the fact that you [had] given information in the Ronda Morrison murder case, and, also, telling you about staying out of trouble and probation; is that what you are saying? *Page 1295 
"A. Yes, sir.
 "Q. You didn't get any more probation from the Judge?
 "A. No, sir, because I didn't go out there and get no ticket or nothing like that, messing up.
"Q. And when did this happen?
"THE COURT: When did what happen?
 "Q. That you was in court, that you were in court before Judge Key.
"A. I do not know the date.
 "Q. Well, figuring it this way, from the time that you spoke with Simon Benson [state investigator in this murder case] and everybody that you said, somewhere between January and April, how much later was it after then?
 "A. I do not know. I don't know when I went to court."
On July 9, 1987, the "public lewdness" charge to which Hooks had pleaded guilty and for which he had been fined on December 3, 1986, was nol prossed, and apparently the fine was never paid. The case action summary of that case, which shows this disposition, is attached to appellant's brief as an appendix, and it also shows that the case was nol prossed at the request of the district attorney, Larry Ikner (an investigator with the district attorney's office), William Gibson (deputy sheriff), Chief Dailey (apparently the chief of police of Monroeville), and "the judge." All of the named persons, with the exception of the judge, whoever that may be, were actively involved in the investigation of the instant murder.
The only other testimony by Hooks, pertinent to the existence of any agreement, is, as follows:
 "DEFENSE: Outside of the information that you have provided in this case by your own testimony, have you been a paid informant for the Sheriff's Department?
"HOOKS: No, sir.
"STATE: I object to that.
 "DEFENSE: You have not? "HOOKS: Didn't nobody pay me to say nothing. Didn't nobody pay me to do nothing."
Appellant argues that Hooks has been favored in some manner by the state in return for his testimony. He contends that the state had an agreement with Hooks for some consideration for his cooperation; that appellant was not advised of it; that Hooks falsely testified in regard to it; and that the prosecution knowingly permitted him to do so. The record now before us does not support these contentions. However, questions are raised by the circumstances surrounding the handling of the misdemeanor charge; Hooks's departure from the Evergreen jail; the proceedings in the Monroe County Circuit Court where, according to Hooks, discussions were had in reference to his statements concerning the murder case; and the fact that all of these events occurred before Hooks's testimony at trial. We think the questions require remandment of this case to the trial court for a hearing to determine what the agreement was between the state and Hooks, if any; whether Hooks had been afforded any favors or extended any consideration in return for his testimony and cooperation; and, if any understanding or agreement existed, whether the information had been furnished appellant prior to trial or whether appellant was aware of any agreement or consideration. We also conclude that the hearing should include an inquiry to determine the precise agreement that existed between the state and Myers at the time he gave his testimony, and to determine whether such information was furnished appellant or whether appellant was aware of such information. The attorney general suggests this procedure in brief and in argument and states in brief that information concerning agreements with the witnesses was furnished appellant informally and, therefore, was not reflected in the record. This is further reason why the case should be remanded for a hearing. While the minute entry reflecting the disposition of Myers's case and the case action summary concerning Hooks's misdemeanor charge are not a part of the record on appeal, we have no reason to doubt their authenticity; and we believe they, along *Page 1296 
with portions of the witnesses' testimony, raise questions which in the interest of time and judicial economy, should be resolved now.
For the reasons heretofore stated, we remand this case to the trial court with instructions to conduct an evidentiary hearing as outlined above. Appellant and his counsel should be present at the hearing. We direct that the hearing be held and due return be filed within 45 days from the date of this opinion, and that said return include all the proceedings conducted below.
We pretermit discussion of all the other issues raised by appellant at this time.
REMANDED WITH INSTRUCTIONS.
All Judges concur.
 APPENDIX
THE COURT: Well, as we know, the State of Alabama and the Code of Alabama prescribes that in cases of this nature that the Court may make definite findings, not only as to the facts which were found by the jury in Baldwin County where this case had been tried on the Defendant's motion, but also about the existence and/or non-existence of mitigating as well as aggravating circumstances.
This Court, of course, had the opportunity of presiding over that trial and has made these findings, as follows.
Now before I get into this, I want to say that when we were in court in Baldwin County some several weeks ago, people in the courtroom were specifically enjoined against making any sort of demonstration, either respecting the approval or disapproval of the jury verdict and the findings of the jury down there.
It is my information that the Court's admonition to that effect was ignored in at least one case and I don't know the disposition of what that proceeding is, Mr. Pearson, but I expect that to be followed up. I mean business about it, about that, and I further mean even more business this morning when I tell you this: that this Court will brook no measure of approval or disapproval at the verdict which this Court will pronounce in this case, and I want to say to you now, if you feel moved that you are going to have to have something to say, or you are going to have to express yourself for or against what this Court will do this morning, now is the time for you to leave because I want to tell you if it happens in this courtroom or in this courthouse, you are going to be held to account and going to be a summary disposition of whatever occurs.
With regard to the existence or non-existence of aggravating factors in this case, this Court judicially knows that the Defendant McMillian was under a suspended sentence of twelve months imprisonment at hard labor for the offense of assault in the third degree imposed by the Circuit Court of Conecuh County on May 8, 1986, and was on probation for this offense at the time of the murder of Ronda Morrison.
(2) The aggravating circumstance listed in Section13A-5-49(2) does not exist and no evidence of such circumstance was offered.
(3) The aggravating circumstance listed in Section13A-5-49(3) does not exist and no evidence of such circumstance was offered.
(4) This Court finds beyond a reasonable doubt that the aggravating circumstance listed in Section 13A-5-49(4) does exist in this case because the capital offense was committed during the commission of a robbery.
(5) The aggravating circumstance listed in Section13A-5-49(5) does not exist and no evidence of such circumstance was offered.
(6) The aggravating circumstance listed in Section13A-5-49(6) does not exist and no evidence of such circumstance was offered. *Page 1297 
(7) The aggravating circumstance listed in Section13A-5-49(7) does not exist and no evidence of such circumstance was offered.
(8) The aggravating circumstance listed in Section13A-5-49(8) does exist and this Court finds beyond a reasonable doubt that the killing of Ronda Morrison during a robbery, when compared with other capital offenses, was a conscienceless and pitiless homicide which was necessarily torturous to the victim, and that it was especially heinous, atrocious and cruel.
Now, with regard to the existence or nonexistence of mitigating factors:
(1) This Court finds that the mitigating circumstance listed in Section 13A-5-51-(1) does not exist in that the defendant does have a significant history of prior criminal activity, all of which is contained in the pre-sentence report of investigation. In making this finding, the Court did not consider charges made against the defendant subsequent to November 1, 1986, which were listed in the report.
(2) The mitigating circumstance listed in Section 13A-5-51(2) does not exist in that the capital offense was not committed while defendant was under the influence of extreme mental or emotional disturbance.
(3) The mitigating circumstance listed in Section 13A-5-51(3) does not exist in that the victim was not a participant in the defendant's conduct and did not consent to it.
(4) The mitigating circumstance listed in Section 13A-5-51(4) does not exist in that the defendant was the principal in the capital offense.
(5) The mitigating circumstance listed in Section 13A-5-51(5) does not exist in that the defendant was not under extreme duress or under substantial domination of another person.
(6) The mitigating circumstance listed in Section 13A-5-51(6) does not exist in that the capacity of the defendant to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was not impaired.
(7) The mitigating circumstance listed in Section 13A-5-51(7) does not exist in that the age of the defendant at the time the crime was committed was forty-five.
In addition to the mitigating circumstances listed in the statute, none of which were argued except Section 13A-5-51(1), the Court has considered all aspects of the defendant's character as revealed by the testimony and the pre-sentence investigation and report. Further, the Court has independently weighed the verdict of the jury which was for life imprisonment without parole and has considered it as an aspect of mitigation, separate and apart from any other mitigating factors.
The Court has weighed the aggravating and mitigating circumstances to determine the appropriate sentence under the law, and has not merely tallied them for the purpose of numerical comparison, but has marshalled and considered them in organized fashion for the purpose of determining the proper sentence in this case. All of such mitigating factors considered are not only those contained in the Code, but those contained in the testimony at the sentence hearing, the pre-sentence investigation and report which is part of the record in this case, and the verdict of the jury which recommended to the Court that defendant be sentenced to imprisonment for life without parole.
The Court finds that the aggravating circumstances are substantial and controlling. Other than the recommendation of the jury, the mitigating factors are considered by the Court to be of no substance when the evidence in the case demonstrates a vicious and brutal killing of a young lady in the first flower of adulthood who happened to be the hapless victim caught up in a chain of circumstances not of her making or choosing and over which she had no control. In the mind of this Court, the only *Page 1298 
appropriate sentence in this case is death by electrocution.
Bring the Defendant around, please.
(The Defendant, counsel for the Defendant, and counsel for the State approached the bench.)
THE COURT: Walter D. McMillian, do you have anything to say why judgment of the sentence of law should not be imposed on you?
DEFENDANT McMILLIAN: Well, only thing I can say, I am not guilty. I like for that girl's parents to know that I did not kill their daughter. I want them to know that.
[1] Section 13A-5-46(f) requires that an advisory verdict recommending death be based on a vote of at least 10 jurors, and a verdict recommending life imprisonment without the possibility of parole must be based on a vote of a majority of the jurors.
[2] The trial court's sentencing order, setting out written findings as to aggravating and mitigating circumstances, is attached hereto as an appendix and is made a part of this opinion.
[3] Hooks did not know Myers's name when he saw him in the truck, but learned it later.