594 So.2d 1253 (1991)
Walter McMILLIAN
v.
STATE.
1 Div. 864.
Court of Criminal Appeals of Alabama.
September 20, 1991.
Rehearing Denied November 15, 1991.
*1257 Bryan A. Stevenson, Montgomery, for appellant.
Don Siegelman, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.

ON RETURN TO REMAND
PATTERSON, Presiding Judge.
On September 21, 1990, we remanded this case to the trial court with instructions that that court hold an evidentiary hearing *1258 to determine whether the state had an agreement with Bill Hooks, Jr., in reference to his testimony in this case, and if so, to determine the facts of that agreement. McMillian v. State, 570 So.2d 1285 (Ala.Cr. App.1990). In addition, we instructed the court to determine whether Hooks had been extended any favors or consideration in return for his testimony and cooperation, and we further instructed the court if it found any favors or consideration to have been extended or an understanding or agreement to exist, to determine whether that information was furnished to the appellant, Walter McMillian, prior to trial or whether the appellant was aware of it prior to trial. We further instructed the court to determine the precise agreement that existed between the state and Ralph Bernard Myers at the time he gave his testimony and to determine whether information about that agreement was furnished to the appellant prior to trial or whether the appellant was aware of such information prior to trial. The trial court has conducted a hearing in accordance with our remand and has filed a return with this court, which includes a transcript of the proceedings below along with written findings of fact. A copy of the findings of fact is attached to this opinion as Appendix A and made a part thereof.
The appellant, relying on Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), contends that he was denied due process of law by the state's failure to disclose an alleged agreement it had with Hooks, a key prosecution witness, in reference to his testimony at trial. After a hearing, the trial court found that there was no agreement between Hooks and the state with respect to his testifying in the appellant's trial. This finding is supported by the testimony at the hearing.
The appellant also contends that the state gave Hooks favorable treatment in exchange for his testimony and that this was not disclosed to the appellant. Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution is required to disclose to the defendant evidence which is favorable to the defendant. The Brady rule applies to impeachment evidence. United States v. Bagley, 473 U.S. 667,105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, the failure to disclose will result in a new trial only where the evidence is material. Id. at 682, 105 S.Ct. at 3383. Materiality in this context exists only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. Id. at 682, 685, 105 S.Ct. at 3383, 3385. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
The matters involving Hooks that the appellant contends constituted favorable treatment and, thus, that should have been disclosed pursuant to Brady are the following: a plea bargain agreement between Hooks and the district attorney in reference to a pending, unrelated burglary charge whereby Hooks pleaded guilty to the lesser offense of trespass, was given credit for the six months that he had been in confinement on the burglary charge, and was released; the assistance of an investigator from the district attorney's office, who also was an investigator in the instant case, in requesting a Monroeville municipal judge to give Hooks more time to pay a fine for an offense of public lewdness; the failure of the Monroeville police to arrest Hooks for the nonpayment of fines and costs resulting from several convictions for traffic offenses; and loans made by the sheriff to Hooks. The appellant also contends that Hooks received reward money in return for his testimony.
Hooks did receive reward money, which was paid after the appellant's conviction; however, there is no evidence that law enforcement officers or representatives of the prosecution ever discussed the possibility of a reward with Hooks. The fact that substantial rewards had been offered in this case was well known by the appellant at the time of trial, and his attorneys mentioned this fact to the jury in their closing argument as a reason that the prosecution witnesses, including Hooks, lacked credibility.
*1259 The record supports the conclusion that the negotiations involving the settlement of the burglary case were not linked in any way to Hooks's testimony at the appellant's trial or to his furnishing information or to his cooperation with the state in the investigation of the death of Ronda Morrison. Hooks's testimony denying any such link or connection is supported by the testimony of the district attorney and of Hooks's defense counsel who had been appointed to represent him in the burglary case. See Appendix A for the trial court's thorough discussion of the circumstances surrounding Hooks's guilty plea.
In reference to the past-due fine for public lewdness, which was, in effect, forgiven by the municipal judge, to the failure of the city to pursue the collection of the traffic fines, and to loans by the sheriff, the record offers no evidence to support a conclusion that these matters, even if considered to be favors, are in any way connected to Hooks's cooperation or testimony in the appellant's case. The investigator, the sheriff, and Hooks denied any connection. The record shows that the manner in which the fine for lewdness was handled was not unusual in Monroeville. The trial court explained this incident as follows: "[The investigator] told the [municipal] judge that Hooks had been in jail for six months on the Conecuh County burglary charge and asked for time to allow Hooks to pay. However, the city judge simply nol prossed the case rather than remitting the fines and costs or setting up a payment schedule." The record also shows that the failure to pursue the collection of the traffic fines was nothing more than laxness in the city's enforcement procedures. We note that Hooks paid the fines after he collected the reward money. In regard to the loans, the sheriff testified that he gave Hooks $75 prior to McMillian's trial so that Hooks could go to Pensacola, Florida, and stay with some relatives for his protection after he had reported to the sheriff that someone had attempted to "run him off the road" and that he feared for his life. The sheriff investigated the report and concluded from the physical evidence that Hooks's report was true. The sheriff also testified that Hooks sought loans from him on other occasions. In his trial testimony, Hooks had admitted that he received loans; he stated that he received $20 from the sheriff on two occasions to go to Pensacola. At the evidentiary hearing on remand, he testified that on one occasion the sheriff loaned him $100. It is not clear from the record when this loan was made. Conceivably, it could have been made after the trial. The sheriff was not questioned about the $100 loan. The sheriff and Hooks denied that the loans were conditioned upon Hooks's cooperation or upon his testifying in the appellant's case. Hooks's denial, at the remand hearing, was a reiteration of his trial testimony that "[d]idn't nobody pay me to say ... [or] do nothing."
The trial court found that prior to trial the appellant was not informed of the investigator's efforts to assist Hooks with the fine for his lewdness case, of the uncollected traffic fines, or of the loans from the sheriff; however, the court pointed out that the state court and municipal court files pertaining to Hooks's cases were matters of public record and were available to the appellant's counsel. The trial court further found that, in regard to Hooks's guilty plea to trespassing, the court file was also available to counsel.
After reviewing the record before us and considering the trial court's findings of fact, we find that, even if the details of the settlement of Hooks's burglary case, the assistance of the investigator leading to the settlement of the lewdness charge and fine, the failure of the Monroeville police to pursue the collection of Hooks's traffic fines, and the undisclosed loans from the sheriff had been disclosed, there is no reasonable probabilitya probability sufficient to undermine confidence in the outcomethat the result of the trial would have been different. We are not willing to conclude, as the appellant urges us to do, that Hooks testified falsely at the trial. While at times Hooks appeared to be reluctant to discuss the loans and the traffic tickets, viewing his testimony in its entirety, we do not believe that the record supports a conclusion that he knowingly testified falsely, *1260 either at trial or during the evidentiary hearing on remand. However, assuming, arguendo, that Hooks knowingly testified falsely in regard to the number and amount of loans from the sheriff or in reference to the traffic tickets, there is no reasonable likelihood that, had the true facts been known to the jury, the verdict in this case would have been affected. See Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766. In reaching this conclusion, we have given some consideration to the fact that Hooks was willing to talk with the authorities from the day that the crime was committed and to tell them what he had seen. He persistently sought them out and made several statements, one of which was recorded. They were all consistent with his testimony at trial. At trial and at the hearing on remand, he vehemently denied any deal with the state or expectation of any benefit involving his testimony against McMillian. His testimony of his observations at Jackson Cleaners on the day of the murder stood up under vigorous cross-examination by experienced defense counsel.
The appellant also claims that the state violated the requirements of Giglio by failing to correct allegedly false testimony by Myers regarding his plea arrangement with the state. The state contends that it did not fail to disclose its arrangement with Myers and that the substance of the arrangement was made known to the jury.
When the reliability of a witness may well be determinative of an accused's guilt or innocence, the nondisclosure of evidence affecting the witness's credibility falls within the rule that suppression of material evidence justifies a new trial irrespective of the good or bad faith of the prosecution; however, a new trial is not automatically required if it is unlikely that the evidence would have changed the verdict. Giglio, 405 U.S. at 153-54, 92 S.Ct. at 765-66. In other words, a finding of materiality of the evidence is required, and a new trial is ordered only if the false testimony could, in any reasonable likelihood, have affected the jury's verdict. Id.
Myers testified before the jury that he had an agreement with the state that, in exchange for his testimony, he would be allowed to plead guilty to a noncapital offense, but that, although he had decided to testify at the appellant's trial, he had not yet decided whether he would enter a guilty plea. He testified, "My lawyer had made the deal that my life would be spared."
The prosecuting attorney testified at the remand hearing that prior to trial he had informed the appellant's trial counsel of the existence and substance of the agreement between the state and Myers. While defense counsel testified that he did not remember being informed of the agreement prior to trial, he would not say that he was not informed. The trial court made a factual finding that defense counsel had been informed of the agreement by the prosecutor prior to trial. The record supports this finding, and we concur in it.
Myers's counsel and the prosecuting attorney testified at the remand hearing, each giving his version of the agreement. The prosecutor testified that initially he wanted Myers to agree to a sentence of life imprisonment without parole in return for a guilty plea, but that Myers refused; that he then agreed to allow Myers to plead guilty to an offense under which Myers could receive life imprisonment, but that he made it clear that he would never recommend less than a life sentence to the trial court; and that the exact offense to which Myers would plead was not decided upon, but was to be decided at a later date. According to the prosecutor, this was the agreement at the time of trial and the agreement of which he informed defense counsel prior to trial. The prosecutor testified, however, that after the appellant's trial, he agreed to allow Myers's counsel to argue for a charge that would permit the court to sentence Myers to less than life imprisonment, if it chose to do so, but that he insisted on recommending life imprisonment.
Myers's counsel testified that, at the time of trial, the agreement was indefinite as to the exact offense under which Myers *1261 would be allowed to plead. He testified that it was understood that, in exchange for Myers's testimony, his capital murder charge would be reduced to an offense carrying a range of punishment from 15 to 99 years or life imprisonment.
Approximately 5 months after Myers testified in the appellant's trial, he pleaded guilty to the offense of robbery in the third degree and was sentenced to 30 years' imprisonment for his part in the commission of the crime.
The trial court found that when Myers testified at the appellant's trial, there was an agreement between Myers and the state that if he testified truthfully, the state would amend the capital charge to a lesser included offense that would carry a lesser penalty than life without parole. The court further found that there was no agreement as to the specific charge or the exact penalty, but there was an agreement that his life would be spared. These findings are supported by the record, and we agree with them.
The record supports the conclusion that the appellant was aware of the agreement between Myers and the state. Indeed, Myers was cross-examined concerning it. While further cross-examination may have brought out additional details about the agreement, it cannot reasonably be argued that his testimony about the agreement was false. It was not. Myers's testimony that he had not made up his mind to enter a plea of guilty at the time he testified is not patently false and has not been shown to be false. This was a matter only he could decide. We find that the substance of the agreement was before the jury for it to weigh in determining the credibility of Myers's testimony. We do not believe that it was misleading. Thus, there was no misconduct on the part of the prosecutor; no testimony has been shown to be false for which the prosecutor would have had a duty to correct. Further, assuming that had the jury had before it any other rendition of the agreement, we find that there is no reasonable likelihood that it would have affected the jury's verdict.
For the above reasons, we find no merit to the appellant's contention that he was denied due process of law by the state's failure to disclose agreements made with witnesses Hooks and Myers, because none existed with Hooks and the state disclosed its agreement with Myers. We further conclude that the appellant was not denied due process by the state's failure to disclose any benefit rendered to Hooks, because any benefit was unconditional and immaterial.
Having reviewed the appellant's contentions I and II of his brief on appeal, and finding no merit therein, we will now address his remaining contentions.

III.
The appellant contends that he was denied his constitutional rights by the trial court's refusal to permit him to fully cross-examine state's witness Myers. A party is entitled to a thorough and sifting cross-examination of the witnesses against him, § 12-21-137, Code of Alabama 1975; however, the trial court is vested with considerable control over the scope of the cross-examination, and its rulings thereon will not be reversed in the absence of a gross abuse of discretion that causes substantial injury to the objecting party. Perry v. Brakefield, 534 So.2d 602 (Ala.1988). The trial court may not limit cross-examination as to a relevant and material matter until the examining party has substantially exercised his right to question the witness thereon. Id.; C. Gamble, McElroy's Alabama Evidence § 136.01 (4th ed. 1991).
The appellant argues that the trial court erred in sustaining the state's objection to certain questions asked of Myers on cross-examination. One question inquired as to how long Myers had spent in prison for a forgery conviction; one sought information from Myers about an unrelated, pending murder case; and one inquired as to when Myers intended to get with his attorney and enter his guilty plea in the instant case. These questions sought to elicit collateral and irrelevant matter; therefore, the trial court did not abuse its discretion in sustaining the objections to *1262 them. The evidence of Myers's criminal record, which was substantial, was before the jury. The jury was made aware that he had been convicted and had served time for burglary, forgery, and theft. The jury was also aware that Myers had made a deal with the state to enter a plea of guilty to a lesser charge at a later time in return for his testimony.
The appellant further contends that he was prohibited from examining Myers as to differences between Myers's first statement to law enforcement officers and his later statement. We find that the record does not support this contention. Myers was thoroughly examined in reference to the statements.

IV.
The appellant contends that various comments made by the prosecutor during closing argument in the guilt phase of his trial constituted reversible error. Since no objection was raised to the prosecutor's comments during trial, we review this issue under the "plain error" standard prescribed by A.R.App.P. 45A. This rule requires that we notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate action when such error has or probably has adversely affected the substantial rights of the appellant. The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert, denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)).
During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its own merits. Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1989).
The appellant complains of comments of the prosecutor concerning the lack of fingerprint and other physical evidence linking the appellant to the crime and the failure of the investigators to find the murder weapon. These comments were obviously prompted by questions directed to state witnesses on cross-examination emphasizing the lack of such evidence. The appellant also complains that comments by the prosecutorimplying that the appellant may have intended to "take advantage" of the victim sexually because of evidence of a struggle at the scene and the condition of the victim's clothing when she was found, comments about Joe High tower's telling a friend that he had seen the appellant's truck at the scene, the comment that Myers and the appellant "ran together," and comments characterizing the killing as "uncivilized" and "befitting animals"were improper. We believe that these comments, when considered in the light of the evidence and circumstances of the case, were not improper. They constitute reasonable inferences which can be drawn from the evidence and legitimate comments on the evidence.
The appellant's contentions that the prosecutor improperly commented in closing argument on the appellant's failure to testify, injected his personal opinions into the case, and attacked the character of the appellant are unsupported by the record and, thus, are without merit. The cited comments cannot be characterized as the appellant so urges.
Our review of the prosecutor's comments, in conjunction with the entire argument and the evidence in the case, convinces us that the comments were not improper. The appellant further contends that a review of the prosecutor's closing argument, *1263 in its entirety, mandates a reversal because of the cumulative effect of alleged numerous instances of improper remarks. We do not agree. We find no error in the comments of the prosecutor during the guilt phase of the trial.

V.
The appellant contends that the state's evidence was insufficient to support his conviction. He preserved this issue for review by a motion for a judgment of acquittal, which was made at the conclusion of the state's case-in-chief, and in a motion for a new trial. In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala.1985); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert, denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980); McBryar v. State, 368 So.2d 568 (Ala.Cr.App.), cert. denied, 368 So.2d 575 (Ala. 1979). See cases collected at 7 Ala. Digest, Criminal Law, at Key No. 1159.3. The action of the trial court in denying a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury at the time the motion was made from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978).
A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Chafin v. State, 333 So.2d 599 (Ala.Cr.App.), cert, denied, 333 So.2d 609 (Ala.1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v. State, 470 So.2d 1331 (Ala.Cr.App.1985). In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v. State, 368 So.2d at 874. See also Ward v. State, 557 So.2d 848, 850 (Ala.Cr. App.1990).
In the instant case, we have examined the evidence presented by the state and, in so doing, have applied the standards of review set out above. The state's evidence is largely circumstantial; however, as we have pointed out, guilt may be established by circumstantial evidence as well as by direct evidence. The evidence presented by the state, which is recited in McMillian v. State, 570 So.2d at 1287-91, along with reasonable and fair inferences to be drawn from it, was sufficient in our opinion, for the jury to exclude every reasonable hypothesis except that of guilt beyond a reasonable doubt. Myers testified that, upon entering Jackson Cleaners immediately after hearing "popping noises," he observed the appellant with a small caliber automatic pistol in his hand, kneeling down behind the counter and taking money from a paper sack and putting it in a "zip-up case," and that he saw the body of a young girl lying on the floor nearby. This is strong evidence of the appellant's guilt of the capital crime charged in the indictment, "murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant," § 13A-5-40(a)(2). For a complete rendition of the evidence introduced at trial, see 570 So.2d at 1287-91.
Accordingly, the appellant's motions for a judgment of acquittal and for a new trial, based on the assertion of insufficient evidence, were properly denied.
The appellant also contends that the guilty verdict is so contrary to the great weight of the evidence that it is palpably unjust and should not be allowed to stand. We find no merit in this contention. For a discussion of the legal principles involving weight of evidence as opposed *1264 to sufficiency of evidence, see Johnson v. State, 555 So.2d 818 (Ala.Cr.App. 1989). See also Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Weight of evidence is a different matter from sufficiency of evidence. The weight of the evidence refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue. Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2215, 2216; Johnson v. State, 555 So.2d at 820. In the instant case, the weight of the evidence is clearly not with the appellant. As we have said, the evidence arrayed against him is strong and sufficient to support his conviction. His defense consisted of attempts to cast doubt upon the truthfulness of the state's witnesses and to establish an alibi. The credibility of the witnesses and the weight or probative force of their testimony was for the jury to determine. Much of the appellant's alibi defense was weakened by the testimony of Earnest Welch, the collector for the furniture company, who testified contrary to several of the alibi witnesses that he was not at the appellant's residence on the day of the killing, but that he was there the day before and by the production of his company's records to corroborate his testimony.
The appellant contends that the trial court erred in denying him a new trial. He contends that he was entitled to a new trial because he was able to prove by newly discovered evidence that Hooks committed perjury in testifying that he left Kenny Blanton's on the day of the killing and drove by Jackson Cleaners. The appellant bases this contention on the testimony of Darnell Houston, who testified at the appellant's hearing on his motion for a new trial that Hooks did not leave Blanton's on the morning of the killing. The granting of a new trial on the ground of newly discovered evidence rests in the discretion of the trial court and depends largely on the credibility of the new evidence. Snider v. State, 473 So.2d 579 (Ala.Cr.App.1985); Robinson v. State, 389 So.2d 144 (Ala.Cr. App.), cert. denied, 389 So.2d 151 (Ala. 1980). The trial court is the factfinder in a hearing on a motion for a new trial, and a condition to the granting of a new trial on the basis of newly discovered evidence is that the trial court must believe the evidence presented. McDonald v. State, 451 So.2d 440 (Ala.Cr.App.1984). We have reviewed the evidence presented by the appellant at the hearing on his motion for a new trial, and we are not willing to conclude that the trial court abused its discretion.

VI.
The appellant contends that he was denied equal protection of the law by the state's exercise of its peremptory jury strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The record does not disclose the racial composition of the jury venire or the petit jury that ultimately heard the case. During the jury selection process, the appellant objected to the state's exercise of three of its peremptory strikes to strike D.E.H., R.M., and R.W. The trial court required the prosecutor to give his reasons for striking these three black venirepersons. It did so without first expressly ruling that a prima facie case of discrimination had been established by the appellant, the procedure recommended by Batson. However, we follow the rule that, when the prosecution's explanations for its strikes are of record, we will review the trial court's findings pertaining to the alleged discrimination, even though the trial court did not expressly find that a prima facie case had been established. See Williams v. State, 548 So.2d 501 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). In such a case, we may fairly conclude that the inquiry implied such a finding and shifted the burden to the prosecutor to come forward with race-neutral reasons for the strikes. Id. Thus, in the instant case, the prosecutor had the burden of articulating clear, specific, and legitimate reasons for the strikes, which relate to the case and which are nondiscriminatory. See Batson, 476 U.S. at 97, 106 S.Ct. at 1723. In our review of the trial court's finding that the strikes *1265 were nondiscriminatory, such finding is accorded great deference on appeal, and we can only reverse if we find that the determination was clearly erroneous. See Ex parte Lynn, 543 So.2d 709 (Ala.1988), cert, denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).
The prosecutor stated that he struck D.E.H. because he had previously been indicted for the crime of receiving and concealing stolen property. The charges were subsequently nol-prossed, but the prosecutor stated that there had been probable cause to believe that he committed the offense. D.E.H. was questioned as to whether he was the same person who had been indicted, and after some hesitation, he admitted that he was.
The prosecutor stated that he struck R.M. because he believed that R.M. had previously been charged in district court with assaulting "some Chinese people." He stated that the charge, a misdemeanor, was later nol-prossed; however, he stated that considerable animosity arose between R.M. and the district attorney while the case was pending. Some question arose as to whether the venireperson in question was, in fact, the person who had allegedly committed the assault. Upon further inquiry, it was learned that the venireperson was not the person who had been accused of committing the assault but was the brother of the accused. The prosecutor insisted upon his right to strike R.M. because he was a member of the family of the person charged with the assault and he knew about it.
The prosecutor stated that he struck R.W. because she was a young female and that he had struck several young females from the venire.
The trial court overruled the appellant's objections to the prosecutor's striking of venirepersons D.E.H. and R.M. and sustained his objection to the striking of R.W. The court ordered R.W. restored to the jury venire.
In overruling the appellant's objections to the prosecution's striking of prospective jurors D.E.H. and R.M., the trial court obviously concluded that the reasons given for the strikes were race-neutral. We find no clear error in the trial court's rulings. We conclude that the reasons given were sufficiently specific and race-neutral. See United States v. Forbes, 816 F.2d 1006 (5th Cir.1987); Scales v. State, 539 So.2d 1079 (Ala.Cr.App.1988). The prosecutor was justifiably concerned about the animosity that may have been harbored by the venirepersons in question because of one's having been indicted and the other's having a family member who had experienced difficulties with the district attorney. Another reason that would naturally give the prosecutor concern about the impartiality of the two was their hesitancy or evasiveness in responding to the questions put to them. The appellant's contention, in his brief, that the prosecutor did not strike white prospective jurors whose situations were similar to D.E.H. and R.M. is not supported by the record.
In a footnote in the appellant's brief, the appellant appears to claim that his constitutional rights were violated because the petit jury or the venire from which the jury was struck did not represent a fair crosssection of the community. He states his claim, as follows: "The racially discriminatory use of peremptory challenges by the state in Mr. McMillian's capital trial also violated the Sixth Amendment's guarantee to a fair cross-section of the community and further requires reversal of the conviction and sentence of death in this case." This claim was not raised in the court below and is raised for the first time on appeal.
The Sixth Amendment right to a jury selected from a representative crosssection of the community does not apply to petit jurors. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). A defendant is not entitled to a jury with a proportionate number of jurors of his race. Love v. State, 507 So.2d 976 (Ala.Cr.App. 1986), aff'd, 507 So.2d 979 (Ala.1987). In order to establish a violation of the fair cross-section requirement for the venire, the defendant must show that the group alleged to have been excluded is a distinctive group in the community, that the representation *1266 of this group in the venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community, and that this underrepresentation is due to systematic exclusion of the group in the jury selection process. Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); Battle v. State, 574 So.2d 943 (Ala. Cr.App.1990), cert. denied, 574 So.2d 943 (Ala.1991); Wesley v. State, 424 So.2d 648 (Ala.Cr.App.1982).
In the instant case, the appellant offered no evidence to support his claim. He has totally failed to establish a prima facie violation of the fair cross-section requirement.

VII.
The appellant contends that the trial court committed reversible error by refusing to charge the jury on lesser included offenses. The record does not disclose specifically what lesser included offenses the appellant requested that the trial court include in its charge, nor does the record contain any written requested instructions on lesser included offenses. The record does show that the appellant requested the court to charge on lesser included offenses and that the court refused. The record shows, in pertinent part, as follows:
"MR. CHESTNUT [defense counsel]: [W]e want to object strenuously to the Judge's decision in a trial conference that he will not charge on lesser included offenses....
"THE COURT: ... I understand your position but the Court is entitled to know what evidence you rely upon as the basis for requesting a charge such as that.
"MR. CHESTNUT: As I recall the evidence is that Mr. Myers says that he came into this store and found some mysterious stranger there. A jury may not even believe him. They may believe that Mr. Myers did it.
"THE COURT: That being the case, they are authorized under their oaths, they'd have to return a verdict of not guilty in this case. That begs the question of whether or not there is a lesser included offense.
"MR. CHESTNUT: We think, Judge, on this evidence a jury might well find there was no aggravation and none of that. They may find there was no attempt at a robbery. There is a dispute in the testimony. One witness said there were dollar bills, currency, left in that cash register.
"THE COURT: All of which is for the jury. The testimony, as I recall it, was that Myers testified when he went there that he observed the Defendant taking money from one place and putting it in his possession, and you got a dead body lying on the floor there who's been killed with a gunshot wound and the Defendant is with a pistol.
"Now, if that is not a capital offense I don't know what it is....
"... The law, as I understand it, is that the trial judge is bound to charge on lesser included offenses if they are reasonably raised by the evidence. In my mind, that does not include speculation on what might have happened. The question is whether or not they are reasonably raised by the evidence, and I give you an exception to that...."
The appellant contends in his brief that there was evidence of a lack of intent to kill, which would have justified an instruction on a lesser included offense. The evidence does not support this contention. The victim was killed by three shots from behind. One shot was fired from close range. All the shots were fired from the same automatic .25 caliber pistol. It can hardly be argued that the killing was unintentional. Myers testified that when he heard the "popping noises," which were obviously the gunshots, he entered the building and saw the appellant with a small automatic pistol in his hand, taking money from a paper bag and putting it into a zip bag, and he saw the body of a girl lying a few feet away. The white stranger he observed in the rear of the building had a piece of pipe in his hand. The only reasonable inference to be drawn from this evidence, if believed, is that the appellant *1267 fired the shots that killed the victim and that the appellant took the money. His defense is that he was not there and that consequently the state's witnesses are lying, a defense which is inconsistent with his contention.
An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). See also Ex parte Hannah, 527 So.2d 675 (Ala.1988). A court may properly refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense. Chavers v. State, 361 So.2d 1106 (Ala.1978).
After reviewing the record in the instant case, we find no evidence which would have supported a charge on a lesser included offense. We agree with the ruling of the trial court. Under the evidence of this case, the appellant was guilty of either the capital offense charged or of nothing at all.

VIII.
The appellant contends that the trial court committed reversible error by denying his motion for a mistrial made when the state's witness Hightower volunteered a comment during his direct examination. The record in this regard shows the following:
"Q [Mrs. Stuart, prosecuting attorney]: And how did you know that it was Johnny D. McMillian's truck?
"A: Because I had been to Johnny D. McMillian's house with other people [to] purchase marijuana.
"MR. CHESTNUT [defense counsel]: Objection.
"THE COURT: Yes, I sustain the objection. I strike that from consideration of the jury, the last part of that, please.
"Q: You knew it was Mr. McMillian's truck, though?
"A: Yes, ma'am.
"MRS. STUART: Nothing further.
"MR. CHESTNUT: Judge, I move for a mistrial.
"THE COURT: Well, Mr. Chestnut, I am not sure that your objection comes in time, your motion comes in time. However, I will take it under submission just for a minute, if you please.
"THE COURT: Now, ladies and gentlemen of the jury, the Defendantexcuse me, the witness has responded to a question by making an additional comment which has been excluded which you know on the State's [sic] own motion. I will note for the record, as the record will indicate, that the objection was just to the answer and the Court struck that of its own motion. Now, the Defendant did not ask that to be done but the Court did it of its own motion.
"Let me say this, ladies and gentlemen of the jury: that the comment, the additional comment, which this witness made relative to his business with the Defendant, is not for your consideration. That statement was improper. It must be disregarded by you and it is not evidence in this case and it should not and cannot under any circumstances be considered by you as evidence.
"Is there any person on this juryall 14 of youis there any person on this jury who will not implicitly follow the directions of the Court in this regard and completely disregard the statement which this witness has made relative to his business with this Defendant?
"The Court seeing no response, I would assume then that you will do so and as I know you will.
"And your motion for a mistrial, Mr. Chestnut, will be overruled and denied."
A high degree of necessity for the granting of a mistrial must be demonstrated before one should be granted. Woods v. State, 367 So.2d 982 (Ala.1978). A trial judge is allowed the exercise of broad discretion in deciding whether that high degree of necessity is present. Id. The entry of a mistrial should be a last resort as in cases of otherwise ineradicable prejudice. Leverett v. State, 462 So.2d 972 *1268 (Ala.Cr.App.1984), cert, denied, 462 So.2d 972 (Ala.1985). When improper statements are made which are eradicable, prompt action by the trial court, impressing upon the jury the importance of not considering the improper matters, removes any prejudicial effect. Id.
In the instant case, we conclude that, not only was any prejudice eradicable, but it was, in fact, eradicated by the curative instructions of the trial court. We find no abuse of the trial court's discretion in denying the motion for a mistrial.

IX.
The appellant contends that he was illegally arrested, that evidence was seized as a result of that arrest, and that such evidence should have been suppressed. While driving alone in his truck on a public highway on June 7, 1987, the appellant was stopped by law enforcement officers on a public highway and arrested pursuant to a Conecuh County warrant for the offense of sodomy. The sodomy charge was unrelated to the charge in the instant case. His truck was taken to the jail for safekeeping, which according to the sheriff was the customary policy. The truck was parked in front of the jail, where it could be constantly observed by the jailer, and the sheriff kept the keys in his office. It was also the policy of the sheriff's office that an impounded vehicle was to be kept at the jail until the arrested driver was released or until he requested that it be released to a third party.[1] On the following day, June 8, 1987, while the appellant was still in jail on the sodomy charge, another warrant was issued, charging him with the murder and robbery of Ronda Morrison, and the warrant was served upon him in the county jail.
The appellant argues that his arrest pursuant to the sodomy arrest warrant was illegal because the warrant was not supported by probable cause and was a pretext to obtain evidence to support a warrant for his arrest for the capital offense. He further argues that his arrest for the capital offense was likewise illegal because it was based upon evidence obtained as a result of his allegedly illegal arrest for sodomy.
The evidence that the appellant contends was illegally "seized" and that he seeks to suppress was his truck, which was impounded and driven to the jail at the time of his arrest for sodomy. In his motion to suppress, he sought to suppress all evidence connected with or arising from his truck. He sought to suppress all photographs of the truck and testimony relating to the truck. The gist of his contention, as we see it, is that the sodomy arrest was for the purpose of allowing the state's three key witnessesMyers, Hightower, and Hooksto get a close look at the truck and that, the arrest of the appellant and the seizure of the truck being illegal, their testimony about seeing the truck at the scene of the crime and identifying it as belonging to the appellant was tainted and therefore inadmissible.
The trial court denied the motion to suppress after an evidentiary hearing.
The arrest of the appellant for sodomy was pursuant to an arrest warrant issued in Conecuh County. The warrant was served upon him at the time of his arrest. While the appellant claimed that there was no probable cause to arrest him, he offered no evidence to support his claim and he did not offer any evidence to show that the arrest warrant was deficient. There is nothing in the record to show the factual basis for the issuance of the warrant. We believe that the burden of showing that the warrant was not based on probable cause lay with the appellant in this instance, and he has failed to meet this burden. See Ex parte Brownlee, 535 So.2d 218 (Ala.1988). See also 4 W. LaFave, Search and Seizure § 11.2(b) (2d ed. 1989); 2 W. Ringel, Searches & Seizures, Arrests & Confessions § 20.4 (2d ed. 1980, Supp. *1269 1991). In the absence of any evidence that the arrest warrant was obtained without probable cause, we must presume that it was properly issued and thus that the arrest was valid.
The appellant also contends that his arrest for sodomy was a pretext to gain possession of his truck so that it could be viewed by the state's witnesses, who could then provide probable cause for the appellant's arrest for the capital offense. The evidence does not support this contention. The probable cause for the issuance of the arrest warrant for the capital offense, according to the sheriff, was a statement from Karen Fore Kelly to the officers that the appellant had told her that he killed Ronda Morrison and a statement from Hooks that he saw the appellant and Myers driving away from Jackson Cleaners in the appellant's truck at the approximate time at which the crime was committed. The record shows that, contrary to the assertions of the appellant, Myers did not implicate the appellant in the crime until June 9, 1987, after the appellant had been arrested for the crime on June 8. The record shows no connection between the sodomy and the capital charges. Myers was in jail at the time of the appellant's arrest, charged with an unrelated murder. The evidence clearly supports the contention that the appellant's arrest for the capital offense was supported by probable cause.
The appellant contends that the fact that Myers, Hooks, and Hightower viewed his truck at the jail is evidence that the arrest for sodomy was a pretext. We do not find the evidence to support this conclusion. There is no evidence in the record that Hightower ever saw the truck at the jail. Myers and Hooks did see it and immediately recognized it, even though it had been painted a different color; however, they, as well as Hightower, were familiar with the truck at the time of the commission of the offense and prior thereto, and each positively identified it as being at the scene of the crime at the time of its commission. Each was positive about his identification and never wavered. Their identifications clearly existed independent of any viewing of the truck at the jail. It cannot be seriously contended that any viewing of the truck at the jail tainted their identifications of it at the scene. The appellant's contention that the sodomy arrest was a pretext to facilitate a viewing of the truck is not supported by the evidence. The state suggests, and we agree, that to attempt to arrange such a viewing in the manner suggested is contrary to reason. Arrangements could have been made for the witnesses to have viewed the truck while it was in the appellant's possession, because he was driving it on a regular basis.
We find nothing improper about the impoundment of the appellant's truck by the sheriff under the circumstances. His actions were fully authorized. See Ringer v. State, 489 So.2d 646 (Ala.Cr.App.), cert, denied, 489 So.2d 646 (Ala.1986).
In conclusion, we find no Fourth Amendment violation. The trial court's denial of the motion to suppress was proper.

X.
The appellant contends that his constitutional rights were violated when he was absent during an argument by his attorneys on a motion for a mistrial before the trial court during an intermission in the trial of his case. The record shows that, shortly before a noon recess, defense counsel held an off-the-record conference at the bench, out of the hearing of the jury. As a result of this conference, the trial court recessed court early and let the jury go to lunch. Thereafter, apparently without the appellant's being present, the following occurred:
"THE COURT: All right, Mr. Chestnut, you want your Defendant in here now?
"MR. CHESTNUT [defense counsel]: No, sir, he [doesn't] have to be in here. You want me to go ahead?
"THE COURT: Yes, sir.
"MR. CHESTNUT: Your Honor, during the testimony of Mr. Ralph Myers a few minutes ago, the mother, I presume, of the victim and the families who are seated on the third row here began to sob openly. The jurorthe last one on the *1270 end, second rowraised up out of his seat after hearing that to see who and where that was coming from, and the mother was being comforted by a man right next to her.
"And we think that this is grounds for a mistrial and we present that motion to you now.
"THE COURT: All right, thank you.
"Mr. Chestnut, the Court did not hear the audible sob or whatever, however you describe it; did not hear that. Of course, I am aware that the parents of the victim are present in court which, as you know, they have a right to be. As a matter of fact, I think under the law they have a right to sit at the counsel table.
"But this is the reason why I, after being informed by you of this fact, this is the reason why I recessed court at this time. But I am not of the opinion that anything which I have either seen or heard would be sufficient grounds upon which to rest a judgment of mistrial, and so therefore your motion is overruled and denied, to which you note an exception.
"MR. CHESTNUT: All right, sir."
A defendant is entitled to be present at every stage of his trial; however, in a noncapital felony case, he may waive his right to continuous presence. Young v. State, 455 So.2d 208 (Ala.Cr.App. 1984). He is prohibited from waiving his right to be present when he is charged with the violation of an offense punishable by death. Berness v. State, 263 Ala. 641, 83 So.2d 613 (1955); Lee v. State, 244 Ala. 401, 13 So.2d 590 (1943). See also A.R.Cr.P. 9.1 (effective January 1, 1991).
We are not concerned in the instant case with a question of waiver. The issue here is whether the appellant's constitutional rights were violated by his absence from the proceedings described above. We note that no objection was made in the trial court to the absence of the appellant from the proceedings, but, on the contrary, that after the court inquired as to whether counsel wanted his client present, the appellant's counsel asked the court to proceed without the appellant's being present. No objection having been made to the appellant's absence in the court below, we must review this issue under the plain error rule. Rule 45A, A.R.App.P.
The Confrontation Clause of the Sixth Amendment guarantees a defendant the right to be present at any stage of the trial when his presence would contribute to his opportunity for effective cross-examination. Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Because of the nature of the hearing at issue in this case, we conclude that the appellant's confrontation rights were not violated by his absence from the proceedings. The proceedings were such that the right of confrontation and cross-examination did not arise because there were no witnesses or evidence to confront.
The Due Process Clause of the Fifth Amendment grants a defendant the right to be present at any stage of a criminal proceeding that is "critical to its outcome if his presence would contribute to the fairness of the procedure." Id. at 745, 107 S.Ct. at 2667. Again, because of the nature of the proceedings, we conclude that the appellant's due process rights were not violated because of his absence. The appellant has advanced nothing to show that his presence at the hearing would have been useful or that a fair hearing was thwarted by his absence. His presence was not required to ensure fundamental fairness or a reasonably substantial opportunity to defend against the charge. See Kentucky v. Stincer; Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934); Newsome v. State, 570 So.2d 703 (Ala.Cr. App.1989), cert, quashed, 570 So.2d 703 (Ala.1990).
We find no merit to the appellant's contentions that his Eighth Amendment rights were violated by his absence.
Based on the foregoing, we find that the absence of the appellant from the proceedings did not constitute plain error. We do not believe that his absence prejudiced him in any way. It certainly did not adversely affect a substantial right, nor could it have *1271 affected the fairness or integrity of the proceedings.

XI.
The appellant contends that the trial court erred in limiting the jury's consideration of mitigating evidence at the sentencing phase of his trial, contrary to the holding in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). As we have previously pointed out, the appellant did not testify in the guilt phase of his trial; however, he testified in the sentencing phase, in part, as follows:

"BY MR. CHESTNUT [defense counsel]:
"Q. Would you please state your name, sir?
"A. Walter McMillian.
"Q. And how old are you, Walter?
"A. Forty-seven.
"Q. Are you married?
"A. Yes.
"Q. How many children do you have?
"A. Three.
"Q. How old are they?
"A. One 26, another one 25 and one 24one 23.
"Q. How far did you go in school?
"A. Ninth grade, something like that.
"Q. You do read and write?
"A. Pretty good. Not the best but I make out.
"Q. And are you asking this jury to spare your life?
"A. Yes, sir.
"Q. Do you yet maintain your innocence notwithstanding the verdict?
"A. Yes, sir.
"Q. Did you know Mr. Myers?
"A. I only know Ralph Myers by Karen Fore [Kelly] sent me a note.
"THE COURT: Mr. Chestnut, I don't want to cut you off, but we are not going to try the case again. Let's stay on the business of mitigation, if you please.
"WITNESS McMILLIAN: I only
"MR. CHESTNUT: Wait a minute.
"Your Honor, that is all."
The Court in Lockett v. Ohio, 438 U.S. at 604, 98 S.Ct. at 2964, held that
"the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
From the questions propounded to the appellant and from his responses, it is obvious that he was denying any involvement in the crime. He was not testifying to matters in mitigation of sentence, but rather was reopening the question of his guilt or innocence, which had already been decided by the jury. The appellant appears to argue, however, that, because he did not testify at the guilt phase, he should have been allowed to deny his guilt at the sentencing phase. His reliance on Lockett v. Ohio to support this contention is misplaced. The Court in Franklin v. Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988), clarified its ruling in Lockett v. Ohio, stating the following:
"Our edict that, in a capital case, `"the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense,"' Eddings v. Oklahoma, 455 U.S. 104, 110 [102 S.Ct. 869, 874, 71 L.Ed.2d 1] ... (1982) (quoting Lockett, 438 U.S., at 604 [98 S.Ct., at 2964] ...), in no way mandates reconsideration by capital juries, in the sentencing phase, of their `residual doubts' over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's `character,' `record,' or a `circumstance of the offense.' This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor."
(Emphasis in original.)
In Hinton v. State, 548 So.2d 547 (Ala. Cr.App.1988), aff'd, 548 So.2d 562 (Ala.), cert, denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), we held, in addressing *1272 a similar issue, that in a sentencing hearing the jury should consider only evidence of aggravating and mitigating circumstances, and not questions of guilt or innocence. We stated the following:
"The scope of nonstatutory mitigating circumstances is set out in § 13A-5-52, Code of Alabama 1975, which provides as follows:
"`In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.'
"We interpret this section to limit mitigating evidence to that which assumes that the defendant committed the crime for which he was convicted."
Id. at 560.
Our holding in Hinton v. State is in accord with Lockett v. Ohio and Franklin v. Lynaugh. We find that the appellant's testimony denying any involvement or guilt in the crime for which he was being sentenced was not relevant to the sentencing proceedings. The actions of the trial court in limiting such testimony and suggesting that the questioning be confined to matters in mitigation were proper. We find no error.

XII.
The appellant raises several issues which arise out of the trial court's sentence of death despite the jury's recommendation of a sentence of life imprisonment without the possibility of parole. He appears to raise both constitutional and nonconstitutional issues.
First, he appears to contend that the override provision of the Alabama death penalty statute, § 13A-5-47(e), is facially unconstitutional. There is no merit to this contention. The United States Supreme Court has held that a defendant in a capital case is not entitled to sentencing by a jury. In Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) the Court held that neither the demands of fairness or reliability in capital cases nor the nature of or the purpose behind the death penalty requires jury sentencing. The courts have upheld the constitutionality of our jury override provision in a number of cases. Ex parte Jones, 456 So.2d 380 (Ala.1984), cert, denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); Parker v. State, 587 So.2d 1072 (Ala.Cr.App.1991); Williams v. State, [Ms. CR-89-633, September 20, 1991], 1991 WL 197836 (Ala.Cr.App.1991), and cases cited therein; Frazier v. State, 562 So.2d 543 (Ala.Cr.App.1989), rev'd on other grounds, 562 So.2d 560 (Ala.1990), and cases cited therein.
The appellant contends that the Alabama override provision is standardless and permits the arbitrary and random imposition of the death penalty. We do not agree. Section 13A-5-47(e), provides:
"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
This statute sets out a standard of review for jury override that meets constitutional requirements. Ex parte Jones. "The whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation." Id. at 382.
The appellant further contends that "evolving standards of decency and Eighth Amendment restrictions against cruel and unusual punishment" mandate that we adopt the Florida standard for jury override prescribed in Tedder v. State, 322 *1273 So.2d 908 (Fla.1975). Tedder provides that in order for a trial court to reject a jury's recommendation of a sentence of life without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ." Id. at 910. We find no merit in this contention. The Tedder standard is not constitutionally mandated. Ex parte Jones, 456 So.2d at 382; Parker v. State. See also Spaziano v. Florida.
The appellant also contends that the trial court summarily dismissed or disregarded the jury's advisory verdict, and imposed the death penalty without applying any standards. We do not agree. The findings of the trial court, which can be found at McMillian v. State, 570 So.2d at 1296-98, show that it fully complied with the requirements of the death penalty statute; that it considered and weighed the advisory verdict of the jury; and that it considered and weighed the mitigating and aggravating circumstances before it reached a decision to override the jury and sentence the appellant to death.
The appellant states in his brief, in effect, that the trial court chose to impose the death sentence in Monroe County rather than in Baldwin County, where the case was tried, in order to please the local population who, he claims, desired to see a death penalty imposed in his case. He argues that this action indicates the arbitrariness of the sentence. There is nothing in the record to support this conclusion. On the contrary, the record supports a conclusion that the trial court closely guarded the appellant's right to a fair trial. It should be remembered that the trial court granted the appellant's motion for a change of venue because of pretrial publicity and tried the case in Baldwin County.
Moreover, it is obvious that the scheduling of the court's sentencing hearing in Monroe County was for the convenience of all concerned, and for no other reason. It was the trial judge's home circuit and the appellant's home county, and it was closer to the homes of the appellant's counsel. In fact, the appellant's counsel agreed to holding the sentencing hearing in Monroe County. The record shows that immediately after the jury returned its verdict recommending a sentence of life without parole and was released, the trial court stated that it would set a sentencing date after it had obtained a presentence report. The court asked if there was any reason the court's sentencing hearing could not be held in Monroe County. Mr. Chestnut, one of the appellant's attorneys, answered, "No, sir."
The appellant also contends that the trial court was improperly influenced by its use of inadmissible evidence and other "extraneous and arbitrary factors" in overriding the jury's recommendation, specifically the victim impact statement. We find no merit in this contention. See particularly part XIII. He further contends that his constitutional rights were violated by the failure of the trial court to give its reasons for overriding the advisory sentence of the jury. We find no merit in this contention.
The appellant's contention that he is entitled under the Constitution to sentencing by a jury is without merit. Spaziano v. Florida.

XIII.
The appellant contends that the trial court committed reversible error in the sentencing phase by considering a victim impact statement in violation of the principles established in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).
The trial court, in complying with § 135-47(b), ordered and received a presentence investigation report. The record shows that the appellant was given an opportunity to examine the report and to challenge any matters in it. He objected to the inclusion of any record of arrests subsequent to the date of the offense. The trial court agreed and stated that such matters would not be considered. Thereafter, the court asked whether appellant had any other objections to the report, and Mr. Boynton, one of the appellant's counsel, stated, "Your Honor, we have gone through it, gone *1274 through it with the Defendant, and we don't challenge anything." The findings of the trial court, 570 So.2d at 1296-98, show that the presentence report was considered by the court in determining the sentence; however, they do not specifically show that the portion of the report that would be considered a victim impact statement was considered. The victim impact statement was brief. It stated that the death of the victim had had a traumatic effect upon her parents, that her parents were receiving counseling in an effort to put their lives back together, that they had no goals in life since their daughter had died, and that they thought an appropriate punishment for the appellant was death.
We do not believe that the victim impact statement here rises to the level of those condemned in Booth and Gathers. Nevertheless, Booth and Gathers have been overruled by the United States Supreme Court in the recent case of Payne v. Tennessee, ___ U.S. ___, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), wherein the Court held that, if a state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. Thus, we find no Eighth Amendment violation in the trial court's consideration of the victim impact statement in the instant case.
Even though the Payne Court held that the state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether the death penalty should be imposed, it also held that in the event victim impact evidence that is introduced is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. Id. at ___, 111 S.Ct. at 2608 (citing Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). We have reviewed the victim impact statement to determine whether it violated the appellant's due process rights. As we pointed out, the statement was brief and did not anywhere near reach the level and extent of the statement condemned in Booth. We find that the statement here was not fundamentally unfair and was what one would reasonably expect from the parents of a victim under such circumstances. We find no due process violation.
The appellant also contends that error occurred by the prosecutor's mention of the victim in closing argument, by "emotional outbursts from members of the victim's family throughout the trial," and by the trial court's consideration of the victim's character in weighing the aggravating and mitigating circumstances. We find no merit in these contentions. The contention that there were emotional outbursts by the victim's family throughout the trial is unsupported by the record. On one occasion during a recess in the trial, the appellant's counsel told the trial court that he had observed a member of the victim's family in the audience sobbing and that a juror had also observed it. The appellant moved for a mistrial. The trial court stated that it did not observe what counsel reported and denied the motion. No other incident of emotional outbursts during the trial appears in the record.

XIV.
The appellant contends that the trial court improperly found that the capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses, as provided under § 13A-5-49(8), Ala.Code 1975. He argues that the trial court's application of this statutory aggravating circumstance to the facts of his case violates his rights under the Eighth and Fourteenth Amendments. He relies, principally, on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).
In comparing capital offenses for the purpose of determining whether a capital offense was "especially heinous, atrocious, or cruel," we adhere to the standard announced in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). In Kyzer, the Alabama Supreme Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8) is that, for a crime to fit *1275 within that section, it must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Id. at 334. See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991).
In the instant case, the trial court correctly instructed the jury on the meaning of the aggravating circumstance set out in § 13A-5-49(8), in accordance with the Kyzer standard. In determining the sentence to impose pursuant to § 13A-5-47, the trial court found the existence of the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 135-49(8). The trial court's written findings concerning the existence of this aggravating circumstance are:
"The aggravating circumstance listed in Section 13A-5-49(8) does exist and this Court finds beyond a reasonable doubt that the killing of Ronda Morrison during a robbery, when compared with other capital offenses, was a conscienceless and pitiless homicide which was [un]necessarily torturous to the victim, and that it was especially heinous, atrocious and cruel."
The appellant argues that there was no evidence as to how the victim actually died. This is not true. The medical testimony shows that the victim died from gunshot wounds in her back. He argues that there was no evidence which would bring this case within the scope of the aggravating circumstance under consideration here, as that aggravating circumstance has been defined by our courts. We do not agree. It is reasonable to conclude from the evidence in this case that the young female victim was first attacked in the restroom, where an attempt was made to bludgeon, strangle, and shoot her; that she escaped from her attacker and ran for her life; and that her attacker pursued her, overtook her, and executed her by firing three bullets into her back. The scratches and bruises on the victim's neck and forehead, her broken necklace lying on the floor, a brick with hair on it found in the restroom, an impression in the wall of the restroom which had apparently been made by the brick being thrown against it, and a bullet hole in the ceiling of the restroom reasonably support the inferences that she was first attacked in the restroom; that an attempt was made to bludgeon, strangle, and shoot her in the restroom; and that she fought with her attacker. The evidence shows that, of the three gunshot wounds in her back, one would have been certainly fatal, one might have been, and one would not have been. One shot was fired at close range, not more than a few inches from her body. This evidence indicates an execution-style crime. The evidence further shows that the victim lived from 10 to 20 minutes after the shots were fired and that she remained conscious for several minutes after being shot. This evidence suggests that she was conscious when she was dragged under the clothing racks and was hidden.
The trial court's findings, along with its instructions to the jury with regard to this aggravating circumstance, reflect a correct understanding and application of the law. It is apparent that the trial court, in weighing the evidence presented as to the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, was being guided by the limitations established in Kyzer and in Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.), cert, denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Bush holds that execution-style slayings, evincing a cold, calculated design to kill, fall into the category of those crimes that are especially heinous, atrocious, or cruel. Id. at 560-61. An execution-style killing sets a crime apart from other capital offenses.
We concur in the findings of the trial court that the evidence established beyond a reasonable doubt that the capital offense for which the appellant stands convicted was especially heinous, atrocious, or cruel compared to other capital offenses. We find the conduct of the appellant, which we have described above, to be conscienceless, pitiless, and unnecessarily torturous to the victim. We have weighed the evidence in the light of the limitations placed upon the construction of this aggravating circumstance *1276 and conclude that it meets the requirements of Kyzer.
Maynard v. Cartwright, upon which the appellant relies to support his contention, is not applicable to the instant case. Hallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert, denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).

XV.
The appellant contends that the trial court's consideration of the pre-sentence report, which he argues contained hearsay, violated his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments. His specific complaint is that the presentence report contained the following statements principally from law enforcement officers and others, to the effect that the appellant had a reputation for being involved in drugs:
"C.R., Sr., age 62, ... stated that he had known the subject all his life. He stated that this subject was the best one of his family and that he did not drink. He further stated that subject was good about paying. According to Mr. Reed, the subject had a reputation of dealing in drugs. He was surprised at this current offense, however. He had stated that he had warned this subject on occasions to get out of drugs but felt that the subject would turn to dealing in drugs some when the paperwood business was slow. He further stated that he felt the subject was a good worker and thought a lot of him.
"....
"Tom Tate, Sheriff of Monroe County, states that he feels that the subject has been involved in drug transactions over a period of several years. He further states that he feels that this case is related to some illegal activity other than robbery.
"Chief of Police William C. Dailey of Monroeville was contacted. He states that he knew the subject by reputation primarily as someone who is involved with drugs. He did state that the subject had never been in much trouble in Monroeville.
"Chief Randy Shoe of Repton, Alabama was contacted. He states that the subject never gave any outward trouble but had a reputation of being involved in drugs and moonshine liquor. He stated that he had arrested people who possessed moonshine that alleged that they had gotten it from the subject."
Section 13A-5-47(b), Ala.Code 1975, governs the consideration of the pre-sentence report and provides:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
At the sentencing hearing before the trial court, the following occurred:
"THE COURT: ....
"Mr. Chestnut [defense counsel] and Mr. Boynton [defense counsel], have y'all had an opportunity to consider the presentence report and investigation?
"MR. BOYNTON: Yes, sir.
"THE COURT: Do you wish to file any challenge to any of those matters placed therein?
"MR. BOYNTON: Yes, sir. Directing the Court's attention to page 4 of the pre-sentence report, it says that as a concern subsequent arrest record
"THE COURT: Let me say this: that any consideration of subsequent arrests, that is, any sort of a record whatsoever as it relates to this Defendant following November 1, 1986, has not been considered by the Court, and a finding of fact will be made to that.

*1277 "Do you challenge any other conclusion in the pre-sentence investigation?
"MR. BOYNTON: Your Honor, we have gone through it, gone through it with the Defendant, and we don't challenge anything.
"THE COURT: Thank you."
As can be seen, the appellant was afforded an opportunity to object to any matter in the report, particularly relating to his reputation for dealing in drugs, and to present evidence about any part of the report that might be disputed. He chose not to do so and stated for the record that he did not challenge anything. This inaction indicates the lack of importance even the appellant placed on these statements.
Moreover, there is nothing in the court's findings that indicate that it considered these statements about the appellant's possible involvement in drug activity in determining the appellant's sentence. After examining the trial court's entire findings, we do not believe that this information had any effect upon the determination of the sentence. We note that the probation and parole officer in his remarks in the presentence report labeled the statements as speculation that other motives might lie behind the killing and stated that such speculation was beyond the scope of his report.
Nevertheless, we find that it was not improper in this case for the presentence report to contain the information concerning possible drug activity by the appellant. See § 13A-5-5, Ala.Code 1975; A.R.Cr.P. 26.3(b). The possibility that drugs may have in some way been involved in the crime as well as the appellant's reputation for dealing in drugs was proper material for the presentence report. That information was properly included as a circumstance surrounding the offense and as the appellant's interests and activities in the community. A.R.Cr.P. 26.3(b)(1) and (5).
Rule 26.3(b) is based in part upon Fed.R.Cr.P. 32(c)(2). Commentary to A.R.Cr.P. 26.3. Thus, the cases interpreting the federal rule are instructive. The right of a defendant to challenge the contents of the presentence report is satisfied when the defendant fails to raise objections before the trial court at sentencing, and his failure to object waives the opportunity to rebut or explain. United States v. Stevens, 851 F.2d 140 (6th Cir.1988); United States v. Matlock, 786 F.2d 357 (8th Cir. 1986). See also Thompson v. State, 503 So.2d 871 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert, denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).
As we have pointed out, the appellant raised no objections to the statements in the presentence report. No objection having been raised below to the presentence report, we can reverse only upon a finding of plain error. We find no error, much less plain error, here.
The appellant also contends that error occurred by the use of a statement from the appellant in the presentence report without a showing that he had waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before making the statement. The officer preparing the report interviewed the appellant and reported that the appellant denied any involvement in the crime. Thus, the statement did not injure the appellant and must be considered harmless.

XVI.
The appellant contends that the trial court's sentencing determination did not meet constitutional requirements for several reasons and that it consequently requires reversal.
The appellant contends that the trial court erred in not finding as a mitigating circumstance that he had no significant history of prior criminal activity. He argues that he had only a single conviction for assault in the third degree. The presentence report, however, shows otherwise. It also shows convictions for disorderly conduct, for misdemeanor possession of marijuana, and for public intoxication. We find that the misdemeanor convictions set out in the presentence report are sufficient to refute the appellant's claim that he had no significant history of criminal activity. We find no error in the trial court's refusal to *1278 find this mitigating circumstance. See Murry v. State, 455 So.2d 53, 66 (Ala.Cr. App.1983), rev'd on other grounds, 455 So.2d 72 (Ala. 1984).
The appellant also claims that his status as a probationer at the time of the instant crime does not support the trial court's finding of the aggravating circumstance that "the capital offense was committed by a person under sentence of imprisonment," § 13A-5-49(1), Ala.Code 1975. "Under sentence of imprisonment" is defined in § 13A-5-39(7), in pertinent part, as follows: "As used in section 13A-5-49(1), the term means ... while on probation or parole...." We find no error in the trial court's finding of the existence of this aggravating circumstance.
The appellant argues that the state failed to prove the sentence of imprisonment referred to above. The sentence of imprisonment and the probation are listed in the presentence report, which was not challenged by the appellant. The trial court also took judicial notice of the conviction and sentence, because it had sentenced the appellant to imprisonment and placed him on probation.
The appellant also complains that the jury was not instructed that it could find this aggravating circumstance. We find no merit to this argument. The appellant could not have been injured by the failure of the court to instruct on this aggravating circumstance, but was aided instead.
The appellant contends that the trial court erred in finding the existence of the aggravating circumstance that the capital offense was committed while the appellant was engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975. We find no error here. Our capital murder statute contemplates that certain aggravating circumstances will be established by certain capital verdicts. Section 13A-5-50, Ala.Code 1975, provides:
"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40."
See also § 13A-5-45(e) (which provides, in pertinent part, that "any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing"). This practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double counting" or "overlap" and has been upheld. See Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert, denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Thus, we find that the aggravating circumstance that the capital offense was committed while the appellant was engaged in the commission of a robbery was established, as a matter of law, by the appellant's conviction of the capital crime of "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." § 13A-5-40(a)(2), Ala.Code 1975. The trial court properly found that this aggravating circumstance had been established. The appellant's additional argument that the jury was not instructed that it could find the existence of this aggravating circumstance is factually incorrect. The record shows that the trial court properly instructed the jury that it could consider this aggravating circumstance.

XVII.
The appellant contends that the prosecutor's argument before the jury during *1279 the penalty phase violated the holding in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in that it sought to undermine the sentencer's sense of responsibility by suggesting that a sentence of death would never be carried out. The specified portion of the prosecutor's argument is as follows:
"[T]he defense is talking about sometime in the future there may be a morning when Mr. McMillian goes to the electric chair. I don't know whether that will ever happen or not, but if it does, it is going to be a long time hence from the time that its happened to another person."
In Caldwell v. Mississippi, the Court set aside a death sentence after the prosecutor suggested to the jury that its sentence was not final because it would be reviewed for correctness by an appellate court. The Court found it "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S.Ct. at 2639-40. We do not read the comments of the prosecutor here to be urging the jury to assume that the responsibility for imposing the death sentence lay elsewhere. In our opinion, the comments did not violate Caldwell. They did not minimize or downgrade the role of the jury in the sentencing process. Thus, we find no merit in this contention. We further note that we do not find that these comments in any way rise to the level of the comments condemned in Ex parte Rutledge, 482 So.2d 1262 (Ala.1984) (wherein the court held as reversible error the prosecutor's comments to the effect that, so long as parole boards, federal courts, and the state legislature exist, there is a chance that the defendant will be released).
Even if we assume that the remarks in this case were improper, as the appellant suggests, they did not injure the appellant because the jury returned an advisory verdict recommending life imprisonment without parole. See Hooks v. State, 534 So.2d 329, 364 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (wherein the court held that any error in prosecutorial comments and jury instructions at the sentencing phase of a capital case is harmless when the jury recommends life without parole).

XVIII.
The appellant contends that his death sentence was the result of racial discrimination. This contention was initially made in a footnote of his brief. He addresses it further in his reply brief. He states: "Racial bias additionally played a role in the imposition of the death penalty against Mr. McMillian. The decision makers involved in his prosecution and sentence of death were impermissibly influenced by race, violating Mr. McMillian's rights under the Eighth and Fourteenth Amendments." He raised this issue in his motion for a new trial, but presented no evidence to support it. There is nothing in the record of this case to support or even to suggest in the slightest way that race influenced the "decision makers" or played any role in the appellant's conviction and sentence. As we have previously stated, the record discloses that every effort was made to ensure that the appellant received a fair trial, and we believe that he did.

XIX.
The appellant contends, in his supplemental brief on return to remand, that the trial testimony of Hooks and Hightower suggesting threats against them as witnesses was inadmissible.
Hooks testified that his failure to disclose to the appellant's wife what he had seen at Jackson Cleaners on the day of the crime was because of what he had perceived to be threats from members of the appellant's family about making statements against the appellant. Practically all of Hooks's testimony in this regard came in response to questions asked on cross-examination. We find that, under the circumstances, Hooks's testimony was proper and admissible. Hooks's having admitted on cross-examination that he had *1280 failed to tell the appellant's wife that he had knowledge of the crime, even though she asked him if he did, it was proper for the prosecutor on redirect to question him about his reasons for remaining silent. No objection was made to this testimony. After reviewing it, we find no plain error.
Hightower testified that he saw the appellant's truck at Jackson Cleaners on the morning of the killing. On crossexamination, he admitted a reluctance to come forward with this information until he was approached by the sheriff a few days before the commencement of the trial. The appellant's counsel cross-examined Hightower about this, as follows:
"Q [DEFENSE COUNSEL:] [D]id you feel remaining uninvolved, staying out... yourself, was your highest duty in regards to what you knew, or are you telling this jury you knew; is that what you felt?
"A. No, sir. It isI was scared. I didn't want
"Q. Of what, Mr. Hightower?
"A. I [was] just scared.
"Q. You didn't kill the girl, did you?
"A. No, sir.
"Q. You didn't see anybody kill the girl, did you?
"A. No, sir.
"Q. What laws had you broke?
"A. Sir?
"Q. Had you broken some laws or something?
"A. No, sir.
"Q. What were you scared of, Mr. Hightower?
"A. I just don't want to be in no trouble.
"Q. What trouble, Mr. Hightower?
"A. Any kind of trouble. I just don't want no trouble."
On redirect examination, the prosecutor continued along the same line of questioning, as follows:
"Q [PROSECUTING ATTORNEY:] You have been questioned at length about why you did not come forward with the information you have had. You have indicated you didn't want to get involved; is that correct?
"A. Yes, ma'am.
"Q. Who or what were you scared of?
"A. I was scared of Johnny D. I just
"Q. Why?
"A. I don't know. Just
"THE COURT: Speak up, please.
"A. Just because the reasons I have been to his house."
After an objection by the appellant was overruled, the prosecutor continued, as follows:
"Q. Mr. Hightower, why were you scared to come forward with this information?
"A. Because when you fool with drugs and you don't know, if you get involved with something like that it could cause you your life, too."
The appellant was seeking to impeach Hightower's credibility by cross-examining him about his long delay in disclosing what he knew about the crime. In the face of such impeaching evidence, a witness may state the reasons for his actions in order to explain them. C. Gamble, McElroy's Alabama Evidence § 159.03(1) (4th ed. 1991). Hightower's silence could be considered the equivalent of a self-contradictory statement for impeachment purposes; therefore, his reasons for this silence were admissible under the circumstances existing here. We find no error in this contention.

XX.
The appellant contends that the trial court's jury instructions defining reasonable doubt were constitutionally deficient. He relies on Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), to support his contention. In the instant case, unlike Cage, no objection was made to the reasonable doubt instructions in the court below; therefore, we must review the issue under the plain error rule.
The appellant directs his complaint regarding the definition of reasonable doubt to the following portion of the jury instructions:

*1281 "Now, when a defendant in any criminal proceedings enters a plea of not guilty, there arises some several things to which he is entitled, the first of these being known as what we know as the burden of proof. By his plea of not guilty, the defendant has cast upon the prosecution the burden of proving to the jury, by the evidence, his guilt beyond a reasonable doubt. In order to prove his guilt to the required standard, the prosecution is required to prove, by the evidence, beyond a reasonable doubt the truth of the elements, or material averments, of the charges against him. These will be explained to you shortly.
"Now, also, in connection with this, there attends this defendant what we know as the presumption of innocence. Each and every defendant who enters a plea of not guilty is presumed by law to be innocent unless and until the prosecution, by the evidence, convinces each of you beyond a reasonable doubt that the defendant is guilty. It is, moreover, the law that this presumption of innocence attends the accused as a matter of evidence to the benefit of which he is entitled throughout the trial and will protect the defendant from a verdict of guilty unless and until the prosecution convinces the jury, by the evidence beyond a reasonable doubt, that the defendant is, in fact, guilty. If this state of the evidence is reached, the presumption will fail and the defendant would no longer be protected from a verdict of guilty.
"Now, I have used the expression `reasonable doubt' some several times and at this time I want to give you the legal definition of it. The term `reasonable doubt' means a doubt which has some good reason for it arising out of the evidence in the case and is such a doubt which you are able to find a reason for in the evidence. It means an actual and substantial doubt growing out of the unsatisfactory nature of the evidence in the case, any part of the evidence in the case, or lack of evidence in the case. It does not mean a doubt which is whimsical, capricious, or ephemeral, or which arises from some groundless surmise or guess. While the law requires you to be satisfied of the guilt of the defendant beyond a reasonable doubt, at the same time it prohibits you from going outside of the evidence to hunt up doubts upon which to acquit the defendant. In arriving at your verdict, it is your duty to consider very carefully all of the evidence in the case and in so doing you should entertain only such doubts which have arisen from the evidence or lack of evidence and are `reasonable' as I have defined the term to you. Unless the doubt is a reasonable one and does so arise, it will not be sufficient in law to authorize a verdict of not guilty.
"Reasonable doubt can never mean absolute certainty. There is no such thing as absolute certainty in human affairs. Justice is, after all, but an approximate science and its ends are not to be defeated by a failure of strict or mathematical proof.
"I think, ladies and gentlemen of the jury, in summation of this aspect of the charge, if each of you ask your inward conscience, `Is the defendant guilty?' and your conscience replies, `There is a reasonable doubt that he is,' you should find the defendant not guilty, but if the answer is, `I have no reasonable doubt of his guilt,' you should find the defendant guilty."
The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined "reasonable doubt" by using the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. The reasonable doubt instruction condemned in Cage, is, in pertinent part, as follows:

*1282 "If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty."
Id. ___ U.S. at ___, 111 S.Ct. at 329 (quoting State v. Cage, 554 So.2d 39, 41 (La. 1989); emphasis added in Cage v. Louisiana).
In holding that the instruction was contrary to the "beyond a reasonable doubt" requirement stated in In re Winship, the Court stated the following:
"In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. Francis v. Franklin, 471 U.S. 307, 316 [105 S.Ct. 1965, 1972, 85 L.Ed.2d 344] ... (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a `grave uncertainty' and an `actual substantial doubt,' and stated that what was required was a `moral certainty' that the defendant was guilty. It is plain to us that the words `substantial' and `grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to `moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." ___ U.S. at ___, 111 S.Ct. at 329-30 (footnote omitted).
In reviewing the reasonable doubt instruction in this case, we do so in the context of the charge as a whole. Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of reasonable doubt in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered prejudicial enough to permit reversal. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Moss, 756 F.2d 329 (4th Cir.1985).
In Cage, the Court found that the use of the words "grave" and "substantial" in the expressions "grave uncertainty" and "actual substantial doubt" suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. The Court further found that the use of such expressions in conjunction with the expression "moral certainty" could lead a reasonable juror to interpret the instruction to allow a finding of guilt based on proof below that required by the Due Process Clause. Obviously, it was not the use of any one of these terms, but rather the combination of all three, that rendered the charge unconstitutional in Cage. See Gaskins v. McKellar, ___ U.S. ___, 111 S.Ct. 2277, 2277, 114 L.Ed.2d 728 (1991) (wherein, in a memorandum opinion, Justice Stevens stated that he thought the Court correctly decided not to grant certiorari on the question of whether Cage announced a new rule because the jury instructions to be reviewed did not contain the specific language condemned in Cage that a reasonable doubt "must be a doubt as would give rise to a grave uncertainty"). In the instant case, the trial court did use the words "actual and substantial doubt" in its explanation of reasonable doubt; however, it did not use the phrases "grave uncertainty" or "moral certainty," which were used in *1283 Cage. Thus, this case is distinguishable from Cage. The use of some, but not all of the phrases examined in Cage does not necessarily constitute reversible error. We have repeatedly upheld reasonable doubt instructions that contained the words "actual and substantial doubt." Earhart v. State, 593 So.2d 119 (Ala.Cr.App.1991)[2]; Williams v. State, [Ms. 89-191, June 14, 1991], 1991 WL 119358 (Ala.Cr.App.1991); Martin v. State, 548 So.2d 488 (Ala.Cr.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 455 So.2d 210 (Ala.Cr.App.), cert. denied, 455 So.2d 210 (Ala.1984).
In reviewing the instant reasonable doubt instruction in the context in which they were given in the charge as a whole, we do not find that this instruction contains the same flaw condemned by the Supreme Court in Cage. Although the words "actual and substantial doubt" were used in the instant instruction, they do not, in our view, cause the same problem that the Court found with the instruction in Cage. We think that the definition of reasonable doubt given the jury in this case correctly conveyed the concept of reasonable doubt and was not misleading or confusing. The trial court's instructions on the presumption of innocence, the burden of proof, and the responsibilities of the jurors in weighing the evidence and using their common sense support this conclusion. We find that the questioned instruction was proper and not constitutionally deficient, as contended by appellant. There is no plain error here.
We note that the questioned instruction substantially followed the pattern jury instructions recommended by the Alabama Supreme Court and in effect at the time.[3] Our supreme court has stated, "[W]e do not think we should hold that the trial judge plainly erred when he instructed the jury pursuant to a pattern jury instruction `recommended' by this Court, especially in the absence of an objection or request from the defendant." Ex parte Harrell, 470 So.2d 1309, 1315 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985) (emphasis in original).
The appellant's additional contention that the court erred in advising the jury that a reasonable doubt is a doubt for which there is a reason and cautioning the jury not to go outside of the evidence to hunt up doubts upon which to acquit the appellant is, when considered in the context of the entire charge, without merit.

XXI.
In accordance with A.R.App.P. 45A, we have examined the record in this case for plain error, whether brought to our attention or to the attention of the trial court or not. We have found no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phases of the trial.
We have also reviewed the appellant's sentence, as required by § 13A-5-53, Ala. Code 1975. Section 13A-5-53(a) requires that, in addition to reviewing the case for any error involving the conviction, we also review the propriety of the death sentence. This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case. Section 13A-5-53(a) also provides that, if we find that no error adversely affecting the *1284 rights of the defendant was made in the sentence proceedings and if the trial court's findings concerning aggravating and mitigating circumstances are supported by the evidence, we shall proceed to review the propriety of the decision that death was the proper sentence. In determining whether death was the proper sentence, § 13A-5-53(b) requires us to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing of the aggravating and mitigating circumstances indicates that death was the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury in the instant case returned a verdict of guilty of the capital offense charged in the indictment, a sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After the jury heard the evidence offered at the sentencing hearing, and after it was instructed on its proper function and on the relevant law by the trial court, it returned an advisory verdict, recommending a sentence of life imprisonment without the possibility of parole, by a vote of seven for life imprisonment and five for the death penalty.
Thereafter, the trial court held another sentencing hearing, in accordance with § 13A-5-47. Prior to that sentencing hearing, the trial court ordered and received a presentence report pertaining to the appellant, as required by § 13A-5-47(b). After the sentencing hearing before the trial court, the court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49 and the existence or nonexistence of any statutory mitigating circumstance in § 13A-5-51 and any nonstatutory mitigating circumstances pursuant to § 13A-5-52, as well as written findings of fact summarizing the crime and the appellant's participation in it. The trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed by a person under sentence of imprisonment (§§ 13A-5-49(1), -39(7)); (2) that the capital offense was committed while the defendant was engaged in a robbery (§ 13A-5-49(4)); and (3) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses (§ 13A-5-49(8)). The trial court examined the evidence for mitigating circumstances, pursuant to the requirements of §§ 13A-5-51 and -52, and found none. However, the court did state, in its findings, that it considered the verdict of the jury recommending life imprisonment without parole "as an aspect of mitigation, separate and apart from other mitigating factors." The court's findings show that it properly weighed the aggravating and mitigating circumstances in accordance with the appropriate statutes; that it considered the evidence presented at the guilt phase and sentencing phases of the trial, the presentence report, and the advisory sentence of the jury; and that it found that the aggravating circumstances outweighed the mitigating circumstance. The trial court found the following: "The Court finds that the aggravating circumstances are substantial and controlling. Other than the recommendation of the jury, the mitigating factors are considered by the Court to be of no substance." Concluding that the only appropriate sentence in the case was death, the trial court sentenced the appellant accordingly.
As required, we have searched the record of both the guilt and the sentence phases of the appellant's trial, and we have found no reversible error. We find no error adversely affecting the rights of the appellant in the sentencing proceedings. We find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. In reviewing the propriety of the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We concur in the sentence and agree with the trial court that death is the appropriate sentence in this case. While we note the absence of mitigating circumstances, except for the jury recommendation considered *1285 as an aspect of mitigation by the trial court, our independent weighing of the aggravating circumstances while noting the absence of mitigating circumstance convinces us that the sentence of death is appropriate and proper in this case.
The appellant was convicted of the offense of murder committed during a robbery in the first degree (§ 13A-5-40(a)(2)), a capital offense by statutory definition. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd., 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), and cases cited therein. Two-thirds of the death sentences imposed in Alabama are in cases of robbery-murder. Id. at 540. Considering the crime committed and the appellant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
The appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

APPENDIX A

RETURN ON REMAND
The court conducted an evidentiary hearing on January 14, 1991, pursuant to the direction of the Alabama Court of Criminal Appeals in its opinion dated September 21, 1990. The issues to be determined at the hearing were as follows:
1. what was the agreement, if any, between the state and Bill Hooks, Jr. concerning his testimony;
2. whether the state afforded Hooks any favors or extended any consideration in return for his testimony and cooperation;
3. whether information concerning any agreement or quid pro quo between the state and Hooks was furnished to the defendant; or was the defendant aware of any agreement or consideration between Hooks and the state;
4. what was the agreement, if any, that existed between the state and Ralph Myers at the time he gave his testimony; and,
5. was the defendant furnished or aware of information concerning the agreement, if any, between the state and Myers at the time of trial.
Upon consideration of the testimony taken ore tenus, the court makes the following finding of facts subject to the review of the record by the Alabama Court of Criminal Appeals.

FINDINGS OF FACT
There was no agreement between Bill Hooks, Jr. and the state with repect to his testifying in the McMillian trial. A plea bargain agreement appears to have been independently reached between the district attorney and Hook's public defender in March 1987 with no discussion of the McMillian case. It followed questioning of Hooks by the DA's investigator during February, 1987. The plea bargain arrangement between the state and Hooks was based on Hooks' lack of participation in the burglary as related by Hooks' codefendant. The state agreed to reduce the charge to trespassing in return for a guilty plea. Upon the agreement's rejection by the court, apparently because the judge was acquainted with the burglary victim's family, the public defender waived Hooks' right to a jury trial and the case was placed on the non-jury docket to re-submit to the court at a later date. The defense attorney requested a setting in early June. The guilty plea was taken one day after Hooks identified McMillian's truck and the defendant by name. However it appears to be happenstance as to timing and place. Hooks had been brought to Monroe county for questioning on the McMillian case and it was convenient to the court and the public defender to culminate the plea agreement reached in March at that time while Hooks was in Monroe county. The evidence at this hearing fully supports Hooks' court file which was available to the defendant at the time of his trial.
*1286 It appears that the investigator for the 35th Judicial Circuit District attorney and the Monroeville police chief did intercede with the municipal judge of Monroeville, at Hooks' request, regarding the payment of Hooks' past due fine assessed by that court on the public lewdness case prior to the commission of the Conecuh County burglary. The investigator, Larry Ikner, spoke with the city judge sometime after Hooks had identified McMillian by name. Ikner told the judge that Hooks had been in jail for six months on the Conecuh County burglary charge and asked for time to allow Hooks to pay. However, the city judge simply nol prossed the case rather than remitting the fines and costs or setting up a payment schedule. The sheriff of Monroe County loaned Hooks money to get out of town after Hooks claimed to have been run off the road following his release from jail and the sheriff investigated the incident. There may have been another loan from the sheriff but the testimony was not clear. It also appears that the Monroeville police did not arrest Hooks on an alias warrant for fines and costs resulting from traffic tickets issued after June 1987 but prior to McMillian's trial. These costs were paid after Hooks received reward money after McMillian's conviction. Hooks, as a result of information provided to authorities, has received between three and five thousand dollars reward money offered by public spirited businesses shortly after the murder. The State of Alabama's reward claim by Hooks is pending final court adjudication.
McMillian's attorneys were not told of the efforts of the District attorney's investigator or the sheriff's loan or loans. Hooks' court files, both in state court and municipal court, were matters of public record and obtainable by McMillian's lawyers. The offered rewards were public knowledge and also available to the defense. No reward was paid to Hooks before McMillian's trial.
At the time Ralph Myers testified there was an agreement between himself and the state that if he testified truthfully at McMillian's trial, the state would amend the capital charge in his indictment to a lesser included charge that would carry a penalty of less than life without parole. There was no agreement as to the specific charge or the exact penalty, but that his life would be spared.
The fact of such agreement and its substance was revealed to the defense attorney, J.L. Chestnut, on an informal basis, probably in the halls of a courthouse prior to the trial. However no details of the plea bargain were discussed during the conversation between himself and the district attorney.
The undersigned judge conducted this hearing at the request of Judge Thomas B. Norton, Jr., on the first working day after Judge Norton's mother's funeral. Due to miscommunication, this judge did not order a transcript at the day long hearing's conclusion. On January 18, 1991, the reporter inquired and I learned that the transcript preparation had not begun. It has now been ordered and will be forwarded to the Alabama Court of Criminal Appeals on or before January 28, 1991.
Done and respectfully submitted this 19th day of January 1991.
 /s/Charles C. Partin
 Circuit Judge

ON APPLICATION FOR REHEARING
PATTERSON, Presiding Judge.
The appellant filed his application for rehearing, with supporting brief, on September 26, 1991. He raises no new issues in this application, and all issues raised therein were addressed and considered by us in our opinions of September 21, 1990, and September 20, 1991. In considering the appellant's application for rehearing, we have reviewed our opinions and judgment of affirmance and have considered the appellant's brief in support of his application, and we are not persuaded to alter our holding.
However, we feel that one issue raised in the application for rehearing required additional discussion. The appellant contended that the trial court committed reversible error in sustaining the state's *1287 objection to questions addressed to the state's witness Ralph Myers, on cross-examination, which apparently sought to elicit information about Myers's involvement in an unrelated murder case in Escambia County. The record in this regard shows the following:
"Q. [MR. CHESTNUT, defense counsel]: You ever hear the name Vicky Lynn Pittman?
"A. [RALPH MYERS]: Yes, sir, certainly have.
"MR. PEARSON [prosecuting attorney]: We object to this and would like to approach the bench.
"(Off-the-record conference at the bench.)
"MR. CHESTNUT: You overrule the question?
"THE COURT: I don't know what the question was.
"MR. CHESTNUT: The question is whether or not he knew Vicky Lynn Pittman.
"WITNESS MYERS: I did not know her but
"MR. PEARSON: I am going to object.
"THE COURT: I sustain the objection. Go on to the next question.
"Q. Were you ever in Escambia County?
"A. Yes, I have been in Escambia County.
"Q. When were you last there?
"MR.PEARSON: Judge, I am going to object unless there is some showing of relevance to this case.
"THE COURT: I sustain the objection.
"MR. CHESTNUT: Judge, I can't make the showing all in one question. If you will give me an opportunity, I will try to show it.
"THE COURT: You show it in the proper way, please. I sustain the objection. Go on to the next question."
The question raised here is whether the trial court erred in sustaining the objections to the questions in the absence of an offer of proof by the appellant. The general rule is stated in C. Gamble, McElroy's Alabama Evidence § 425.01(4) (4th ed. 1987), as follows:
"It is generally agreed that the trial court is in error when it sustains an objection to a question propounded to a witness and the answer to that question is prima facie relevant and competent testimony. When an objection is made and sustained to such a question, it is unnecessary for the questioning party to make an offer of proof in order to predicate his appeal upon that error. The appellate court will deem the exclusion of the answer erroneous and prima facie prejudicial.
"Contrary to the above, if the trial court sustains an objection made to a question which does not on its face show what is the expected answer, it then becomes the duty of the questioning party, in order to predicate his appeal upon this as an erroneous ruling, to make an offer of proof. This should be done by calling the court's attention to the expected answer and explaining the relevancy of such an answer." (Footnotes omitted.)
In the instant case, what the appellant expected to prove by the questions was not suggested by the questions themselves; thus, any answers to the questions were not prima facie relevant and competent testimony. The questions on their face, not disclosing what the expected answers would be or the relevance of the answers, required an offer of proof by the questioning party in order to predicate an appeal upon the ruling. Here, the appellant did not call the court's attention to the expected answers and explain their relevancy. The trial court gave the appellant an opportunity to do so, but the appellant failed to respond.
"The primary reason for the offer of proof is that it better enables the trial judge to consider further the claim for admissibility of such evidence. The secondary reason is that the offer of the proposed answer places the same in the official record for the benefit of the appellate court called upon to decide whether *1288 there has been error committed in the ruling."
Id. at § 425.01(1).
Here, the rulings of the trial court, sustaining the objections of the state to the questions propounded on cross-examination on the grounds of relevancy, were not erroneous. In the absence of an offer of proof explaining the relevancy of the expected answers, the trial court could not be held in error, and, hence, there is nothing for us to review.
In the appellant's brief, he recites purported facts concerning the disposition of the murder case in Escambia County and states certain conclusions. He states that Myers and the appellant were indicted for the murder of Vicky Lynn Pittman in Escambia County; that Myers pleaded guilty to the offense; and that the charges against the appellant were dismissed. There is nothing in the record of the instant case concerning these purported facts. They are brought out for the first time in the appellant's brief. The only reference to the Escambia County murder case in the record before us is found in a newspaper clipping dated June 18, 1987, which was filed by the appellant as an exhibit to a pretrial motion for a change of venue. This article stated, in pertinent part, the following:
"McMillian and Myers were also charged with the murder of Vickie Lynn Pittman in Escambia County. The body of Ms. Pittman, a high school senior, was found in the Brooklyn Community of Escambia County in April.
"Both men were still in custody Wednesday but their whereabouts were not disclosed for security reasons, said Monroe County Sheriff Tom Tate. The case will be presented to the November session of the Monroe County Grand Jury, he added.
"Tate said that no connections have been made between the Morrison and Pittman murders and that the Morrison case was still under investigation."
These comments in a newspaper article contained in a pretrial motion for change of venue and the assertion of purported facts in brief, which are unsupported by the record, certainly do not qualify as, or constitute a substitute for, a proper and timely offer of proof.
OPINION EXTENDED; APPLICATION OVERRULED.
All Judges concur.
NOTES
[1] The record shows that the appellant's wife went to the jail and requested that the truck be released to her, but that her request was denied. However, her testimony shows that she asked for the truck after the appellant had been charged for the murder and robbery of Ronda Morrison. The sheriffs refusal to release the truck to her was not improper because the truck was then material evidence in the capital case against the appellant.
[2] In Earhart, 593 So.2d at 120, in noting that "it appears that the term `grave uncertainty' is the key phrase which the Supreme Court found offensive," the court relied on what it considered to be a recent United States Supreme Court memorandum opinion, Gaskins v. McKellar, ___ U.S. ___, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991). However, upon another examination of Gaskins, we note that the quoted opinion is that of Justice Stevens and is not to be attributed to a majority of the Court. Although this misconception lent weight to our holding in Earhart, we find that, even with the correct impression of the impact of Gaskins, we would still hold as we did in Earhart.
[3] Alabama Pattern Jury Instructions: Criminal (Alabama Bar Institute for Continuing Legal Education 1980).